[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**August 4, 2005**
**THOMAS K. KAHN**
**CLERK**

No. 04-14744

D. C. Docket No. 01-01132-CV-ORL-19-KRS

LEA CORDOBA,

Plaintiff-Appellant,

BERNARD DEMPSEY,

Appellant,

versus

DILLARD'S, INC.,
a foreign corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(August 4, 2005)**

Before TJOFLAT and KRAVITCH, Circuit Judges, and MILLS[*], District Judge.

TJOFLAT, Circuit Judge:

This case began when Lea Cordoba sued Dillard's, Inc. in September 2001, asserting claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and the Florida Civil Rights Act (FCRA), Fla. Stat. § 760.01 et seq. In February 2003, the district court granted Dillard's motion for summary judgment on all claims, Cordba v. Dillard's, Inc., 2003 WL 21295143 (M.D. Fla. Feb. 24, 2003), and we affirmed in an unpublished opinion, 82 Fed. Appx. 219, No. 03-11105 (11th Cir. Sept. 10, 2003). While Cordoba's appeal from the order granting summary judgment was still pending, Dillard's filed a motion in the district court seeking attorney's fees and litigation expenses from Cordoba and her attorneys under the ADA's fee-shifting provision, 42 U.S.C. § 12205; 28 U.S.C. § 1927; and the court's inherent power. The district court granted Dillard's motion, Cordoba v. Dillard's, Inc., 2003 WL 21499011 (M.D. Fla. June 12, 2003), and subsequently ordered Cordoba to pay $10,000 in attorney's fees and litigation expenses and $9,579.95 in costs[1] and her attorney, Bernard H. Dempsey, Jr., to

---

[*] Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

[1] Costs were assessed separately and were not part of the award of attorney's fees and litigation expenses. Because Cordoba has not challenged this assessment on appeal, it is unaffected by our decision.

2

pay $191,339.95 in attorney's fees and litigation expenses. Cordoba and Dempsey appealed, and we now reverse.

## I.

### A. Cordoba's Termination

In October 1997, Dillard's hired Cordoba as a sales associate in the lingerie department of its store in the Seminole Towne Center shopping mall in Sanford, Florida. The position required no special skills, and the parties agree that Cordoba was a competent employee. Cordoba earned between $8 and $9.70 per hour while at Dillard's.

Cordoba was one of about 250 employees in the Sanford store. The store is managed by a store manager, who is assisted by an operations manager. The operations manager has the authority to discipline and terminate employees. Each department within the store is managed by an area sales manager (ASM), who reports directly to the store manager. At the time of Cordoba's termination, her immediate supervisor was Tambrina Stossel, the ASM in charge of the lingerie department. The store's operations manager was Kathy Groo.

On June 17, 2000, a customer approached Cordoba to return a nightgown. Because Cordoba had some concerns as to whether the nightgown matched the customer's receipt or was even Dillard's merchandise, she felt that she should

3

consult an ASM before accepting it for a refund. Stossel was not in the store, so Cordoba called Edye Sebben, the ASM in charge of another department. Cordoba claims that Sebben was rude to her and caused unnecessary delay in processing the return. Sebben, however, says that she was completely professional and that Cordoba inexplicably refused to give her necessary information about the nightgown over the phone. In any event, Sebben eventually authorized a refund and, sensing that Cordoba was unhappy, asked Cordoba whether she liked working at Dillard's. Cordoba, in essence, replied that she hated working at Dillard's and continued to do so only because she needed the insurance.

Cordoba insists that she gave a "sarcastic" response to what she perceived to be Sebben's unwarranted hostility. Sebben, in contrast, took Cordoba's declaration at face value and said that she was "shocked." Sebben mentioned the incident to Stossel when she saw her two days later. Stossel, in turn, insisted on taking the matter to Groo. After Sebben and Stossel related the incident to Groo, Groo asked Stossel to accompany Cordoba to Groo's office to discuss the matter.

When Stossel and Cordoba arrived in Groo's office, Groo asked Cordoba about the incident with Sebben, and Cordoba admitted saying that she hated working at Dillard's. Groo says that she "was surprised that [Cordoba] had no explanation . . . or apology" for her behavior. Cordoba, however, says that she

4

explained that Sebben had "verbally attacked" her and that her response was merely sarcastic. In any event, Groo, Cordoba, and Stossel all agree as to what transpired next: Groo told Cordoba that if she did not like her job, she could no longer work at Dillard's. Cordoba says that she then tried to persuade Groo to reconsider, explaining that she worked very hard and would not have continued at Dillard's for three years if she did not like her job. According to Cordoba's own affidavit, her pleas were to no avail: "Ms. Groo did not want to hear my explanation. She just kept interrupting me and telling me that if I did not like my job I could not work at Dillard's. While refusing to listen to me, Ms. Groo handed me my termination papers."

## B. Cordoba's Heart Condition

In January 2000 (while she was still working at Dillard's), Cordoba was diagnosed as suffering from supraventricular tachycardia (SVT), a congenital heart disorder. During an SVT episode, Cordoba's heart would palpitate rapidly, sometimes at a rate of more than 200 beats per minute. During her employment at Dillard's, these episodes were sporadic, sometimes occurring only every few months and sometimes occurring every few days. Sometimes the episodes lasted only a few minutes, while others lasted an hour or more. Generally, Cordoba was able to abate the episodes herself through breathing exercises and massage. After

5

an episode, she usually felt dizzy and fatigued. Cordoba claims to suffer from an unusually severe form of SVT. Additionally, she claims that her medications have caused various other problems, including hair loss, leg pains, and hot flashes. Cordoba discussed her condition with several of her Dillard's coworkers on a number of occasions.

Cordoba first consulted a doctor about her condition in July 1998, but the doctor was unable to determine its precise cause. In August 1998, the doctor had Cordoba wear a heart monitor for twenty-four hours. Cordoba describes the monitor as "plainly visible," and at least one co-worker noticed it and recalled discussing it with her. For several months, the doctor prescribed a variety of medications for Cordoba, but these drugs had undesirable side effects and failed to control her condition fully. In May 1999, for example, Cordoba had to leave work and go to the hospital because of an episode. In January 2000, she again had to leave work as the result of an episode. It was on this occasion that an emergency-room doctor finally diagnosed her as having SVT. As a result, Cordoba's doctor prescribed a more potent combination of medications and referred her to a cardiologist. In March 2000, the cardiologist recommended that she undergo a surgical procedure called a catheter ablation, which would sever the defective cardiac circuit responsible for her SVT episodes. Cordoba scheduled the surgery

for the summer of 2000.

Stossel was aware of Cordoba's condition, as the two had discussed it on at least a few occasions. Specifically, Cordoba says that she told Stossel that she had been diagnosed with SVT, that she would be undergoing surgery to alleviate the condition, and that she would need a couple of weeks off to recuperate. Cordoba recalls Stossel being "curious" and wanting "to know exactly what would go on during the procedure" because Stossel had a similar condition and took similar medications. At least once, Stossel noticed Cordoba sitting down during work, and Cordoba explained that she was resting because she was experiencing palpitations. Also, because Stossel was her supervisor, Cordoba reported to Stossel when she had to leave work because of an attack. Finally, Cordoba says that Stossel was her supervisor in January 2000 when an episode forced her to leave work and go to the emergency room. Stossel recalls discussing Cordoba's condition and upcoming procedure with her, but says that she was not Cordoba's supervisor at the time of her January 2000 trip to the emergency room.

In March or April 2000, Cordoba asked Stossel for a reduction in hours and requested that she not have to work nights because her medication was causing her to feel fatigued. Stossel told Cordoba that she could not fulfill these requests immediately because doing so would require hiring a new employee. A month or

7

so later, Dillard's honored Cordoba's requests.

As operations manager, Groo had very little contact with Cordoba and averred that she "had absolutely no inkling . . . Cordoba had any health problems." Cordoba produced no evidence that directly contradicted Groo's testimony. In October 1998, Groo met with Cordoba about some unexcused absences and tardies. Cordoba recalls explaining to Groo that she "had been sick and . . . was going to a lot of doctors' appointments and getting a lot of testing done." She told Groo that the doctors were not sure what was wrong with her, as they had not yet been able to diagnose her condition. At her deposition, Groo did not specifically recall this meeting, but her records did indicate that it had taken place. Cordoba does not claim to have discussed her condition with Groo on any other occasions. Stossel and Groo both stated that they never discussed Cordoba's condition, and Groo was not aware that Cordoba had requested or received a reduction in hours. Finally, nothing in Cordoba's personnel file indicates that she been diagnosed with SVT or even had a heart condition.

## II.

### A. Cordoba's ADA/FCRA Claims

In September 2001, Cordoba filed suit against Dillard's under the ADA and the FCRA, alleging that she was discriminated against because of her heart

condition. In February 2003, the district court granted summary judgment in favor of Dillard's. For the purposes of its order, the court assumed that Cordoba's heart condition was a "disability" under the ADA, recognizing that the issue presented "an exceedingly thorny question of fact for which the parties [had] compiled a voluminous and conflicting record of expert medical testimony and related documents." Cordoba, 2003 WL 21295143, at *8. However, the court found that Cordoba could not survive summary judgment because she had failed to create a material issue of fact as to whether Groo was aware of her alleged disability. And because Groo alone was responsible for Cordoba's termination, Cordoba could not establish that she had been fired "because of [her] disability." 42 U.S.C. § 12112(a) (emphasis added); see also Fla. Stat. § 760.10(a) ("It is an unlawful employment practice for an employer . . . [t]o discharge . . . any individual . . . because of such individual's . . . handicap . . . ." (emphasis added)); Wimberly v. Sec. Tech. Group, Inc., 866 So. 2d 146, 147 (Fla. 4th DCA 2004) ("Because Florida courts construe the FCRA in conformity with the ADA, a disability discrimination cause of action is analyzed under the ADA."). See generally Cordoba, 2003 WL 21295143, at *8-12.

In the course of its opinion, the district court "note[d] with concern that, quite apart from the question of what Defendant knew, there is serious reason to

9

doubt even that Plaintiff considered herself to be disabled at any time during her tenure at Dillard's." Id. at *9. In fact, in her post-termination application for unemployment benefits, Cordoba indicated that she was not disabled. The court reasoned that it was "not reasonable to suppose that . . . Groo[] had concrete, actual knowledge of Plaintiff's disability when Plaintiff herself appeared ignorant about such status and did not consider herself to be disabled." Id.

The court also rejected Cordoba's argument that Dillard's could be held liable on the theory that it had "constructive knowledge" of her disability, the obvious flaw in this theory being that if Groo did not have actual knowledge of Cordoba's disability, she could not have fired her "because of" the disability. Id. at *9-11. The district court cogently explained why, as a matter of logic, Cordoba's "constructive knowledge" theory made no sense:

> Even if [Cordoba] could prove that [Dillard's] had "constructive knowledge" of her disability for some other purpose, it is logically impossible for Ms. Groo to have fired [Cordoba] because of the latter's disability without actual knowledge of that disability. To put it another way, [Cordoba's] allegation that Ms. Groo fired [her] pretextually implies as a matter of logic that Ms. Groo had to have had actual knowledge of [Cordoba's] disability. Otherwise, how can there have been pretext?

Id. at *10.

On appeal, we affirmed. We agreed with the district court that "an employer

10

cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability," and that Cordoba had failed to show that Groo, the relevant corporate decisionmaker, was aware of her alleged disability. Cordoba, No. 03-11105, slip op. at 3 (quoting Morisky v. Broward Co., 80 F.3d 445, 448 (11th Cir. 1996)) (alteration omitted). We also rejected Cordoba's constructive knowledge theory because "discrimination cannot be based on the constructive knowledge of the decisionmaker, or what the decisionmaker should have known." Id. at 6. Similarly, we rejected Cordoba's related contention that "Stossel's explicit knowledge of her illness created institutional liability for Dillard's." Id. at 6. We explained that, "[a]lthough Stossel was aware of Cordoba's disability, her knowledge cannot be imputed to Groo or Dillard's." Id. Finally, we noted that Cordoba challenged—as a matter of fact and as a matter of law—the district court's apparent reliance on the fact that she did not consider herself disabled. But because we concluded that the district court had reached the correct judgment, it was unnecessary for us to address this issue. Id. at 7-8.

B. Dillard's Motion for Attorney's Fees, Expert Fees, and Other Expenses

While Cordoba's appeal from the district court's order granting summary judgment was pending, Dillard's filed a motion in the district court seeking to recover attorney's fees, expert fees, and other expenses pursuant to 42 U.S.C. §

12205,[2] 28 U.S.C. § 1927,[3] and the court's inherent power.[4]  In June 2003, before this court had issued an opinion in the initial appeal in this case, the district court granted Dillard's motion on all three grounds and referred the matter to a magistrate judge for further proceedings concerning the amount of fees and expenses to which Dillard's was entitled.

The district court's order first addressed the ADA's fee-shifting provision, 42 U.S.C. § 12205.  The Supreme Court has held that in civil-rights cases the "plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff

---

[2] Section 12205 provides that in ADA cases "the court . . . , in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses, and costs . . . ."

[3] Section 1927 provides that "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

[4] See generally Chambers v. NASCO, Inc., 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) (holding that district courts retain the "inherent power" to impose sanctions, including attorney's fees, where a litigant has engaged in bad-faith conduct).  In Byrne v. Nezhat, 261 F.3d 1075 (11th Cir. 2001), we stated that a court must be "cautious in exerting its inherent power" and that, "[b]ecause the court's inherent power is so potent, it should be exercised 'with restraint and discretion.'" Id. at 1106 (quoting Chambers, 501 U.S. at 50, 111 S. Ct. at 2132).  In Byrne, counsel "filed a frivolous lawsuit, in bad faith, for the purpose of extorting a settlement," and, moreover, "abused the judicial process" by becoming a "willing participant in [his co-counsel's] continuing vendetta against the [defendants]." 261 F.3d at 1117.  As such, we had no difficulty affirming sanctions against him as a valid exercise of the district court's inherent power, id. at 1116, although we did reverse as to the sanctions entered against the plaintiff herself, id. at 1117-27.  The patently frivolous claims and extreme conduct involved in Byrne exemplify the sort of claims and conduct that ordinarily warrant sanctions against counsel.

12

continued to litigate after it clearly became so." Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 422, 98 S. Ct. 694, 701, 54 L. Ed. 2d 648 (1978) (addressing Title VII's fee-shifting provision); Bruce v. City of Gainesville, 177 F.3d 949, 951-52 (11th Cir. 1999) (holding that the Christiansburg standard applies under the ADA's fee-shifting provision). "[I]f a plaintiff is found to have brought or continued such a claim in bad faith, there will be an even stronger basis for charging him with the attorney's fees incurred by the defense." Christiansburg, 434 U.S. at 442, 98 S. Ct. at 701. In this context, the district court "must focus on the question whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful." Sullivan v. Sch. Bd. of Pinellas County, 773 F.2d 1182, 1189 (quoting Jones v. Texas Tech Univ., 656 F.2d 1137, 1145 (5th Cir. Unit A Sept. 1981)[5]). In the cases in which we have sustained findings of frivolity, plaintiffs have typically failed to "introduce any evidence to support their claims." Sullivan, 773 F.2d at 1189. Other factors that may be relevant to this inquiry include "(1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown

[5] In Bonner v. Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

trial on the merits." Id. The Sullivan factors, however, are "general guidelines only, not hard and fast rules," and "[d]eterminations regarding frivolity are to be made on a case-by-case basis." Id.

At the outset of its analysis, the district court explained that it was unnecessary for it to determine whether Cordoba was disabled; in fact, the court stated that it had "only cursorily reviewed the medical evidence" the parties had submitted on that issue. Cordoba, 2003 WL 21499011, at *2 n.6. In the district court's view, the evidence that Groo had any knowledge of Cordoba's disability was so plainly insufficient as to make Cordoba's claim frivolous even assuming that she was disabled. On this point, as in its order granting summary judgment, the court seized upon the fact that Cordoba herself—at least at the time she was fired—did not appear to think of herself as "disabled":

> How could [Cordoba], knowing that she never thought of herself as disabled, have claimed in good faith that Ms. Groo had actual knowledge of any alleged disability? Where would Ms. Groo or any other person at Dillard's have learned of [Cordoba's] disability except from [Cordoba] herself? The fact that [Cordoba] did not consider herself to be disabled, much less someone who met the statutory definition of a person with a protected disability, forecloses the possibility that anyone else at Dillard's did, and therefore correlatively forecloses the possibility that she was fired because of her alleged disability. This is elementary logic, and how [Cordoba] had the temerity to accuse Ms. Groo and [Dillard's] of unlawful discrimination is inexplicable.

14

Id. at *3 (first two emphases added). In other words, the district court suggested that a plaintiff who does not consider herself disabled can never be discriminated against "because of" her disability. In any event, the court went on to find that Cordoba had produced no evidence that Groo was actually aware of her disability, but had instead relied solely on "raw and unsubstantiated conjecture." Id.

The district court then assessed Cordoba's constructive knowledge theory and concluded that this theory was more than just wrong; as the court put it, Cordoba's theory that Groo could have fired her "because of" a disability that Groo knew nothing about was the equivalent of suggesting that "one can be a bigot without being a bigot." Id. at *5. The court went on to criticize this argument as inconsistent with the "simplest principles of logic and commonsense," and even remarked that it was "baffled that [Cordoba] was willing to commit her spurious theory to paper in light of [Silvera v. Orange County Sch. Bd., 244 F.3d 1253 (11th Cir. 2001)], which emphatically rejected such nonsense." Cordoba, 2003 WL 21499011, at *5 & n.13.

Thus, it was clear to the district court that Cordoba had fallen far short of establishing a prima facie case. Given that Cordoba was seeking $900,000, it was also clear that Dillard's settlement offer of $10,000 was nominal and "clearly an effort . . . to save . . . the enormous legal expense of further litigation." Id. at 6.

15

As such, the offer was not significant to the court's frivolity determination; in fact, in the district court's view, "that [Cordoba] blindly pushed past a generous, though still nominal, settlement offer strongly militate[d] in favor of attorney's fees." Id. (emphasis added). The court therefore concluded that an award of attorney's fees under the ADA's fee-shifting provision was appropriate.

The court also held that Dillard's was entitled to attorney's fees from Cordoba's counsel under both 28 U.S.C. § 1927 and the court's inherent power. On this point, the court began by stating that, under either § 1927 or its inherent power,

> [t]he proper standard in the Eleventh Circuit for an award of attorney's fees from opposing counsel is conduct tantamount to bad faith. In other words, in contradistinction to several of its sister circuits, the Eleventh Circuit does not require an express factual finding by the Court that Plaintiff's counsel acted in deliberate bad faith, merely that counsel's conduct sunk so far beneath a reasonable standard of competence, much deeper than mere negligence, that it became essentially indistinguishable from bad faith.

Id. at *7 (citations omitted). Dillard's agrees that this is an accurate statement of the law in this circuit, but Cordoba and her counsel argue that our precedent does, in fact, require a specific finding of actual, subjective bad faith. Our cases are perhaps somewhat unclear on this point: either they require subjective bad faith, which may be inferred from reckless conduct, or they merely require reckless

conduct, which is considered "tantamount to bad faith."[6]  Whether this distinction

is ever significant, it is unimportant in this case for reasons that we explain in part

III.B, infra.

The district court found that counsel had acted in "reckless disregard" of a

"serious defect[]" in Cordoba's case: Groo's lack of knowledge of her alleged

disability.  Id. at *8.  On this point, the court again noted that Cordoba did not

consider herself disabled, and that even Cordoba's own deposition yielded no

suggestion that Groo was aware of her heart condition.  The district court was

further frustrated by the fact that "[a]t some point . . . , counsel obviously grasped"

this defect and "[y]et instead of retreating from the brink, either through a quick

settlement or voluntary dismissal, counsel led [Cordoba] on a full charge over the

edge, arguing preposterously that actual knowledge did not matter, only

---

[6] See, e.g., Schwartz v. Millon Air Inc., 341 F.3d 1220, 1225-26 (11th Cir. 2003) (§ 1927); Thomas v. Tennoco Packaging Co., 293 F.3d 1306, 1320 (11th Cir. 2002) (inherent power); Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998) (inherent power); Avirgan v. Hull, 932 F.2d 1572, 1582 (11th Cir. 1991) (§ 1927).  The language in these cases suggest that the § 1927 standard is essentially the same as the inherent-powers standard.  In Roadway Express, Inc. v. Piper, 447 U.S. 752, 767, 100 S. Ct. 2455, 2465, 65 L. Ed. 2d 488 (1980), however, the Supreme Court upheld a ruling awarding costs under § 1927 even while stating that "the trial court did not make a specific finding as to whether counsel's conduct . . . constituted or was tantamount to bad faith, a finding that would have to precede any sanction under the court's inherent powers."  Roadway Express thus implies that the two standards are at least slightly different and that § 1927 does not require a specific finding that counsel acted in, or engaged in conduct tantamount to, bad faith.  After Roadway Express, Congress amended § 1927 to permit courts to award attorney's fees in addition to "costs," but it did not otherwise alter the statute's substance.  See Pub. L. No. 96-349, § 3, 94 Stat. 1154, 1156 (1980).

17

constructive knowledge." Id. In sum, the court concluded that because one theory of Cordoba's case had no basis in fact (actual knowledge) and the other had no basis in law (constructive knowledge), Cordoba's attorneys had "engaged in conduct tantamount to bad faith" in pursuing the case all the way to summary judgment. As such, it held that an award of attorney's fees and expenses was appropriate under both § 1927 and the court's inherent power. Id. at *9.

The district court held that Dillard's was entitled to (1) "all reasonable fees—legal, expert, paralegal, and otherwise—that [it] incurred during any discovery related to the question of [Cordoba's] alleged disability" and (2) "all reasonable fees for its summary judgment motion, attorney's fees motion, and any other motion it had to address because of [Cordoba's] decision not to concede once it became, or should have become, apparent that Ms. Groo had no knowledge of any alleged disability." Id. at *10. The court then referred the matter to a magistrate judge to determine the amount of Dillard's award and what portion of that award Cordoba herself should be required to pay (with Cordoba's attorneys being personally responsible for the balance).[7]

---

[7] The district court instructed that the award against Cordoba herself should be an amount sufficient to "(1) convey to [Cordoba] the Court's dissatisfaction with the conduct of her counsel and the merit of her claim; (2) place similarly situated plaintiffs on notice that they have an affirmative duty to participate actively in their cases and exercise control over their lawyers; and (3) create disincentives for the blind pursuit of claims that have been exposed through discovery as frivolous." Cordoba, 2003 WL 21499011, at *10

18

The magistrate judge found that Groo's lack of knowledge of Cordoba's alleged disability should have been apparent to Cordoba and her counsel after Groo's deposition was completed on October 18, 2002. Based on this determination, it recommended that the court award Dillard's $201,339.95 in attorney's fees and expenses. It further recommended that $10,000 in attorney's fees be assessed against Cordoba, with the remainder ($191,339.95) to be assessed against her attorney, Bernard Dempsey.[8] The district court overruled all objections to the magistrate's report and adopted it in its entirety. This appeal followed.

## III.

### A. Standard of Review

The district court's decision to award fees and expenses under the ADA's fee-shifting provision is reviewed for abuse of discretion. E.g., Bonner v. Mobile Energy Servs. Co., 246 F.3d 1303, 1304 (11th Cir. 2001) (Title VII case). This deferential standard of review encompasses even the threshold determination that a plaintiff's case was so "frivolous, unreasonable, or groundless," Christiansburg

---

[8] The district court initially ordered that the portion of the award not assessed against Cordoba should be apportioned equally between Dempsey and an associate in Dempsey's firm. Dempsey, however, acknowledged that his co-counsel had acted in accordance with his instructions, and he did not contend that any portion of the award should be assessed against her. Consistent with this representation, the magistrate judge recommended that the remainder of the fee award be assessed entirely against Dempsey.

19

Garment Co., 434 U.S. at 422, 98 S. Ct. at 701, as to justify an award of attorney's fees under the ADA. Cf. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 399-405, 110 S. Ct. 2447, 2457-61, 110 L. Ed. 2d 359 (1990) (holding that a district court's legal conclusion that counsel violated Rule 11 is reviewed for abuse of discretion); Pierce v. Underwood, 487 U.S. 552, 557-63, 108 S. Ct. 2541, 2546-49, 101 L. Ed. 2d 490 (1988) (holding that a district court's legal conclusion that the Government's position was not "substantially justified" under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), is reviewed for abuse of discretion). However, "when determining whether a claim was or became frivolous, we view the evidence in the light most favorable to the non-prevailing plaintiff." Johnson v. Florida, 348 F.3d 1334, 1354 (11th Cir. 2003) (citing EEOC v. Pet, Inc., 719 F.2d 383, 384 (11th Cir. 1983)). The abuse-of-discretion standard also applies to the extent that the district court's order relies on 28 U.S.C. § 1927 or the court's inherent power. E.g., Schwartz v. Millon Air, Inc., 341 F.3d 1220, 1225 (11th Cir. 2003) (§ 1927); Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998) (inherent power). "An abuse of discretion occurs if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous." In re Red Carpet Corp. of Panama City Beach, 902 F.2d 883, 890 (11th Cir. 1990).

20

## B. The ADA Fee-Shifting Provision

We first consider whether Cordoba's claims were so objectively "frivolous, unreasonable, or groundless" as to justify a fee award under the ADA's fee-shifting provision. Christiansburg Garment Co., 434 U.S. at 422, 98 S. Ct. at 701. We address this question first because if the award cannot be upheld on this basis, then it also cannot be upheld under § 1927 or as an exercise of the court's inherent power, which both require, in addition to objective frivolity, a finding that counsel engaged in conduct that was at least "tantamount to bad faith," see supra note 6 and accompanying text. As we read it, Cordoba's memorandum of law in opposition to summary judgment (summary-judgment memo) presented three distinct theories as to why there were genuine issues of material fact regarding the defendant's knowledge of her disability. First, she argued that Groo had actual knowledge. Second, she argued that Stossel had actual knowledge and was, to at least some extent, involved in the termination decision. Third, she advanced a constructive-knowledge theory. We address each theory in turn.

### 1. Groo's Actual Knowledge

First, we agree with the district court that Cordoba fell far short of creating a genuine issue as to whether Groo was aware of her disability. Citing only her own affidavit and deposition, Cordoba's summary-judgment memo argued that "before

21

Ms. Groo terminated her, [she] informed Ms. Groo that she was scheduled to have heart surgery." But even Cordoba's affidavit (which was filed with her summary judgment-memo) states that Groo told Cordoba that she "could not work at Dillard's" before Cordoba informed her that she "needed [her] job so that [she] could have health insurance for [her] heart surgery." Cordoba's memo may have meant only that she told Groo about the surgery before she was officially handed her termination papers—which Dillard's also disputes—but Groo had already made the decision to fire Cordoba at that point, and that decision clearly was not made "because of" Cordoba's disability. Cordoba's only other support for this theory was her own recollection of a meeting with Groo that took place more than a year before she was fired. At this meeting, Groo apparently inquired about some unexcused absences and tardies, and Cordoba explained only that she had missed some work because of doctors' appointments, and that the doctors had been unable to determine why she was not feeling well. Given that Cordoba herself told Groo that her own doctors could not diagnose her condition, this meeting could not have put Groo on notice that Cordoba was disabled.

Thus, as this court previously held, "[n]one of this evidence allows the inference that Groo actually knew Cordoba was disabled before she decided to fire her, much less that Groo fired Cordoba because of her disability." Cordoba, No.

22

03-11105, slip op. at 4. The relevant question now, however, is whether that evidence was so obviously deficient that Cordoba and her counsel should be forced to pay Dillard's attorney's fees and expenses.

Although Cordoba's case was exceedingly weak on this point, it was not so weak as to make it frivolous for her to argue that Groo's knowledge of her disability presented a triable issue of fact. As the Seventh Circuit explained in this context, "unsupported speculation . . . does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." Hedberg v. Ind. Bell Tel. Co., 47 F.3d 928, 931-32 (7th Cir. 1995). In Hedberg, the plaintiff had told his supervisor that he had a "possible major health problem," but, because he wanted it "kept private," he asked that the supervisor "not tell anybody else." Id. at 930. About one month later, the defendant decided to fire the plaintiff. Id. The plaintiff's supervisor "reported occasionally" to the relevant decision-maker about the plaintiff's job performance, but in his affidavit he stated that, as the plaintiff had requested, he did not disclose the plaintiff's "possible major health problem" until well after the decision to fire the plaintiff had been made. Id. at 931-32. Given the plaintiff's "urgent" request that his supervisor not disclose his illness and the total lack of

evidence suggesting that the supervisor had done otherwise, the Seventh Circuit concluded that the plaintiff's argument that the supervisor was lying "was mere conjecture, unsupported by any evidence or reasonable inference." Id. at 932. Thus, summary judgment was appropriate because there was no evidence that the decision-maker was aware of the plaintiff's disability when he made the decision to fire him.

In this case, while we agree with the district court that Cordoba's argument was pure conjecture, the context of her dismissal at least makes her speculation somewhat less unreasonable than was the case in Hedberg. First, Cordoba had told Groo that she had been "going to the doctor a lot"—although this was more than a year before she was fired, and she also stated that the doctors "weren't sure what was wrong". Second, whereas in Hedberg the plaintiff's supervisor became aware of the plaintiff's condition only a month before he was fired, Stossel had been generally aware of Cordoba's condition for quite some time. Third, several other Dillard's employees were generally aware of Cordoba's condition as well. Thus, whereas in Hedberg the plaintiff sought to keep his condition private, Cordoba appears to have frequently discussed her condition with her coworkers.

Under these circumstances, although Cordoba could ultimately do no more than speculate that Groo was aware of her condition, this speculation was not so

24

unreasonable that it can be termed frivolous. To be sure, Cordoba's claims were weak, and it is easy at this point to recognize that the court and all parties involved would have been better off had they never been pursued. But in awarding attorney's fees against ADA plaintiffs, we must take care not to "undercut the efforts of Congress to promote the vigorous enforcement" of the Act. Christiansburg, 434 U.S. at 422, 98 S. Ct. at 701. To this end, it is important that courts not

> engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

Id. at 421-22, 98 S. Ct. at 700-01. Because Cordoba's claims, though weak, were not entirely "without foundation," id. at 422, 98 S. Ct. at 700, the district court's award of fees and expenses constituted an abuse of discretion.

### 2. Stossel's Actual Knowledge

In our prior opinion affirming the district court's order granting summary judgment, we stated that "[a]lthough Stossel was aware of Cordoba's disability,

her knowledge [could not] be imputed to Groo or Dillard's." <u>Cordoba</u>, No. 03-11105, slip op. at 6. Because the district court expressly avoided—and we did not decide—the question whether Cordoba was "disabled" under the ADA, it is clear that we meant, at most, that Stossel was aware of the general nature of Cordoba's heart condition (i.e., her <u>alleged</u> disability).[9] There was no evidence, however, that Stossel was involved in the actual decision to fire Cordoba. Like her allegation that Groo was aware of her heart condition, Cordoba's belief that Stossel was involved in this decision was speculation. As such, this theory of her case created no genuine issue of material fact and was not an adequate ground for opposing summary judgment.

But the question we address now is whether Cordoba's theory can meet the substantially lesser standard of "not frivolous." Although Cordoba was never able to come up with any evidence that Stossel was involved in the termination

---

[9] Cordoba argues that our statement that "Stossel was aware of Cordoba's disability" establishes Stossel's actual knowledge of her alleged disability—for whatever that may be worth—as the law of the case. "Under the law of the case doctrine, both the district court and the court of appeals generally are bound by findings of fact and conclusions of law made by the court of appeals in a prior appeal of the same case." <u>United States v. Robinson</u>, 690 F.2d 869, 872 (11th Cir. 1982). In our prior opinion, however, we went on to hold that Stossel's knowledge was essentially irrelevant because she was not involved in Groo's decision to fire Cordoba. Thus, the prior panel may have simply assumed Stossel's awareness for the purpose of its decision. The law-of-the-case doctrine does not apply to assumed positions. <u>See</u> 18B Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 4478 (2d ed. 2002). In any event, we conclude that Cordoba did create a genuine issue of fact as to whether Stossel was aware of her alleged disability. This issue, however, was not a "material" one because Stossel did not participate in the decision to fire Cordoba.

26

decision—and Dillard's presented credible evidence to the contrary—we do not think that it was entirely unreasonable for Cordoba to hope that the court would permit her case to go to a jury on this theory. After all, only Stossel, Groo, and Cordoba were present when Cordoba was fired. Moreover, given that Sebben did not intend to report her confrontation with Cordoba to Groo, Stossel's decision to do so was actually something of a "but for" cause of Cordoba's termination.

These circumstances at least make Cordoba's theory less unreasonable than the one the Seventh Circuit considered in Hedberg, supra. There, the plaintiff conceded that his supervisor had completed his written evaluations of the plaintiff before he became aware of the plaintiff's illness, and there was no indication that the supervisor was present either when the defendant's department heads decided to fire the plaintiff, or when the plaintiff was actually fired. See Hedberg, 47 F.3d at 930-32. As such, Cordoba's theory that Stossel was at least partly responsible for her termination was not entirely frivolous—although, again, it was close.

### 3. Constructive Knowledge

Finally, Cordoba argued that Dillard's had "constructive knowledge" of her alleged disability because employees other than Groo (1) were aware of her condition and scheduled surgery, (2) had observed her experiencing heart palpitations, (3) knew that she had left work and gone to the emergency room once

because of heart palpitations, and (4) had accommodated her request for a reduction in hours. The district court rightly rejected this theory. The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a) (emphasis added). As a matter of logic, Groo could not have fired Cordoba "because of" a disability that she knew nothing about. This is why we have said that "[d]iscrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1262 (11th Cir. 2001); see also Brungart v. BellSouth Telecomm., Inc., 231 F.3d 791, 800 (11th Cir. 2000) ("The BellSouth corporation itself did not actually make the decision to take the adverse employment action; Nelson made that decision, albeit on the corporation's behalf. Because Nelson did not know of the protected conduct, he could not have taken that action on the corporation's behalf because of the protected conduct. This is another way of saying that the fact the employer is a corporation does not relieve a plaintiff of the burden of showing a causal connection between the protected conduct and the decision to take the adverse employment action."). Stated differently, even if we had gone along with Cordoba's theory and "imputed" these employees' knowledge to Dillard's the corporate entity, Cordoba's claim still would have failed because Dillard's the

corporate entity did not make the decision to fire her. Rather, Groo fired Cordoba, and since Groo was unaware of Cordoba's alleged disability, she obviously did not fire her "because of" the alleged disability.

In support of her constructive knowledge theory, Cordoba's summary judgment memo cited two cases from this circuit, Breda v. Wolf Camera & Video, 222 F.3d 886 (11th Cir. 2000), and Hilburn v. Murata Elecs. of N. Am., Inc., 181 F.3d 1220 (11th Cir. 1999), and one Ninth Circuit decision, Kimbro v. Atlantic Richfield Co., 889 F.2d 869 (9th Cir. 1989). The reason for Cordoba's citation to Breda eludes us. That case stands for the unexceptional proposition that when an employer designates a specific person to receive complaints of sexual harassment, the employer is deemed to have actual notice of such complaints when they are made to the designated person. See Breda, 222 F.3d at 889-90. There is absolutely nothing in Breda to suggest that constructive knowledge is a substitute for actual knowledge in a discriminatory-discharge action under the ADA. At the summary-judgment stage, Kimbro and Hilburn did not aid Cordoba's constructive-knowledge theory either, but they do require somewhat more discussion for the purposes of the issue we now address.

In Kimbro, the plaintiff (Kimbro) sued his former employer (ARCO) under the Washington anti-discrimination statute for failing to reasonably accommodate

29

his migraine condition.  Although Kimbro was ultimately fired as a result of absenteeism (which was caused primarily by his migraine headaches), his lawsuit alleged a failure to make reasonable accommodations, rather than discriminatory discharge.  ARCO argued that it could not be held liable because the management personnel who decided to fire Kimbro were unaware of his condition.  The Ninth Circuit, however, rejected this defense because Kimbro's immediate supervisor was fully aware of Kimbro's condition, and, under ARCO's own policy, had a responsibility to report this information to the ARCO managers who, in turn, had the authority to accommodate Kimbro's disability.  In fact, this supervisor participated directly in absenteeism-related disciplinary decisions—although he did not make the ultimate decision to fire Kimbro.  Under these circumstances, the court held that the supervisor's knowledge was chargeable to ARCO under general state-law agency principles.  See Kimbro, 889 F.2d at 872-73, 875-77.

Kimbro plainly is not on point here, and the district court rightly criticized Cordoba's reliance on it.  See Cordoba, 2003 WL 21295143, at *10-11.  First, that case was about reasonable accommodations, not discriminatory discharge.  Second and most important, although ARCO management lacked actual knowledge of Kimbro's disability, Kimbro's supervisor was aware of his condition and was responsible, under ARCO's own policy, for communicating that information to

management. Thus, ARCO was essentially arguing that it could avoid liability because its own internal policies had broken down. In this sense, Kimbro is analogous to Breda: it holds, at most, that when an employer designates a supervisor as an employee's contact point for personnel matters such as reasonable accommodations, the employer cannot later defend a failure to make reasonable accommodations on the ground that the supervisor failed to relate the employee's disability to relevant decision-makers within the company. This principle plainly has no applicability to a case such as this one where an employee alleges that the employer's stated reason for firing her is a pretext for disability discrimination. A "pretext" is "a purpose or motive alleged . . . in order to cloak [one's] real intention." Webster's Third New International Dictionary 1797 (1993). It simply defies logic to argue that Groo's "real intention" was to fire Cordoba "because of" a disability that Groo knew nothing about.

In Hilburn, we affirmed the district court's decision granting summary judgment in favor of the defendant on the plaintiff's ADA discriminatory-discharge claim because the plaintiff failed to establish that she was disabled within the meaning of the ADA. Hilburn, 181 F.3d at 1231. At the outset of our analysis, in the context of discussing the elements of a prima facie case, we stated, "[The plaintiff] must establish that [the defendant-employer] had actual or

31

constructive knowledge of the disability." Id. at 1226 (emphasis added). Our

opinion includes no further discussion of this aspect of the plaintiff's case. We

must concede, however, that this stray comment lends some support to Cordoba's

constructive knowledge theory—a theory that otherwise, as the district court

correctly concluded, "evinces no fidelity to the simplest principles of logic and

commonsense." Cordoba, 2003 WL 21499011, at *5. We must also acknowledge

that a similar statement can be found in another Eleventh Circuit opinion, albeit an

opinion that also did not address this aspect of the plaintiff's case. See Gordon v.

E.L. Hamm & Assocs., 100 F.3d 907, 910 (11th Cir. 1996) (stating that "a plaintiff

must demonstrate that the employer had either actual or constructive knowledge of

the disability or considered the employee to be disabled"). Finally, we must point

out that even in the very precedent that the district court thought to be "directly

relevant and devastating to Plaintiff's case," Cordoba, 2003 WL 21499011, at *9,

we observed that "[o]ther courts have rejected the contention that a plaintiff can

sustain a prima facie case of handicap discrimination without proof that an

employer had actual or constructive knowledge of an applicant's disability,"

Morisky, 80 F.3d at 448 (citing Hedberg, 47 F.3d 928).[10]

---

[10] In Morisky, we issued a one-sentence per curiam opinion "affirm[ing] the judgment of the district court for the reasons stated in [its] dispositive order," which we reprinted as an appendix to our opinion. Morisky, 80 F.3d at 446. The quoted statement is thus from the district

32

In granting summary judgment in favor of Dillard's, the district court correctly disregarded these references to "constructive knowledge" as dicta. Once the issue is framed clearly, it is evident that an employee cannot be fired "because of" a disability unless the decisionmaker has <u>actual</u> knowledge of the disability. At this point, however, the issue is no longer whether Cordoba's constructive knowledge theory is legally viable (it is not); rather the issue is whether—in light of our opinions in <u>Morisky</u>, <u>Hilburn</u>, and <u>Gordon</u>—it was frivolous and without any foundation at the summary-judgment stage of the case.

As to this question, we find it difficult to condemn Cordoba's theory as frivolous, built as it was from language in our own opinions. The district court relied heavily on our opinion in <u>Morisky</u>, concluding that it was "directly relevant and devastating" to Cordoba's position.[11] But even that opinion did not directly

court's order, which our opinion, in turn, endorsed.

[11] The district court was also "baffled that [Cordoba] was willing to commit her spurious theory of constructive knowledge to paper in light of <u>Silvera</u>, which emphatically rejected such nonsense." <u>Cordoba</u>, 2003 WL 21499011, at *5 n.13. In <u>Silvera</u>, the defendant-school board fired the plaintiff-employee because it became aware that the plaintiff had pled no contest to lewd assault on a child and had been arrested twice for battery and once for aggravated assault. 244 F.3d at 1256. The district court denied the defendant's motion for summary judgment because it thought that a jury could reasonably infer that the defendant's stated reason for firing the plaintiff—his criminal history—was a pretext. One reason that it thought this was a permissible inference was that the plaintiff allegedly told one board member about his no-contest plea and first battery arrest when he was hired fourteen years earlier. The district court thought this knowledge should be imputed to the entire board. <u>Id.</u> at 1261-62. In reversing, we stated,
> Even assuming the Board that fired [the plaintiff] in 1996 was composed of
> exactly the same members as the Board that had hired him fourteen years

33

dispel Cordoba's theory. There, we stated that "the issue the Court must address is narrow: Will knowledge that an applicant for employment has a disability be imputed to a prospective employer from knowledge that the applicant has taken special education courses and cannot read or write." Morisky, 80 F.3d at 447. Thus, as the opinion itself says, the "narrow" issue we addressed was whether an employer is on notice of an alleged disability simply because it is aware of a problem that may be, but is not necessarily, the result of an underlying mental impairment. We did not address the theory, advanced in this case by Cordoba, that a supervisor's knowledge of a disability should be imputed to the employer. In fact, the opinion in Morisky emphasizes more than once that no employee of the defendant was aware of the alleged disability. See id. ("At no time did [the plaintiff] inform anyone employed by [the defendant] that [she] had a . . .

---

earlier—which is unlikely—if the Board had no actual knowledge of [his] two arrests from the 1970's when it hired him in 1982, it did not actually know of those arrests at that time, and all the imputing in the world is not going to change that fact. Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.

Id. at 1262.

Although we agree with the district court that Silvera's reasoning undercuts Cordoba's constructive-knowledge theory, we do not agree that it so clearly refuted her theory as to make her argument frivolous and without foundation. As with Morisky, Silvera is not on all fours with the instant case. It did not consider whether a supervisor's knowledge of an employee's protected status should be imputed to the employer. Thus, while Silvera's reasoning was ultimately extended to this case, that it would be was not so clear ex ante to make Cordoba's argument frivolous. Given that we had alluded to the possibility of a claim based on constructive knowledge in Hilburn, Gordon, and Morisky, there was some basis for her theory.

34

disability."); id. at 448 (noting the plaintiff's concession that she never "informed any of the employees of [the defendant] of her specific disability"). Moreover, it consistently referred to the knowledge of the defendant "Broward" or "Broward County," rather than the knowledge of any individual decision-maker. It was, of course, unnecessary for the opinion to say more: if no employee of the defendant was aware of a plaintiff's disability, then the relevant decision-maker obviously was not aware of it either. But because the opinion did not say more, it did not directly resolve the question raised by Cordoba's claims.

To be clear, Cordoba's theory lacked support in logic and commonsense, and we have never specifically endorsed it. Its fundamental flaw lies in the fact that a decision-maker who lacks actual knowledge of an employee's disability cannot fire the employee "because of" that disability. Moreover, the cases cited by the district court all but completely undermine it as a viable argument in this context.[12] Nonetheless, having stated in three different cases that an ADA plaintiff must establish that her employee had "actual or constructive knowledge" of her disability, we cannot now say that it was "frivolous, unreasonable, or without foundation," Christiansburg, 434 U.S. at 422, 98 S. Ct. at 701, for Cordoba and

---

[12] See, e.g., Morisky, 80 F.3d at 448-49; Silvera, 244 F.3d at 1262; Brungart, 231 F.3d at 800; Hedberg, 47 F.3d at 932-33; Pressley v. Haeger, 977 F.2d 295, 297 (7th Cir.1992).

her counsel to rely on these statements as the foundation for one theory of their case.

### 4. Cordoba's ADA Claim Was Not Frivolous

In sum, the defendant itself described Cordoba as a "good," "competent," or, at the very least, "average" employee. Prior to her confrontation with Sebben, Cordoba had received no serious reprimands. Sebben herself said that she was "surprised" to learn that Cordoba was fired as a result of the incident. The district court assumed for the purposes of summary judgment that Cordoba was disabled, recognizing that this issue presented an "exceedingly thorny question of fact." And when the court ruled on Dillard's motion for attorney's fees and expenses, the district court stated that it had "only cursorily reviewed the medical evidence" relevant to this issue. Given that we must "view the evidence in the light most favorable to the non-prevailing plaintiff," Johnson, 348 F.3d at 1354, we also assume that Cordoba was disabled for the purposes of deciding this appeal. This case thus involves a competent employee, who we assume to be disabled within the meaning of the ADA, who was fired as a result of her first significant violation of her employer's work rules. It is in this light that we must assess the frivolity of Cordoba's (1) allegation that Groo was aware of her disability, (2) allegation that Stossel was involved in Groo's decision, and (3) constructive knowledge theory.

36

Although we fully agree that Cordoba's allegations regarding Groo's knowledge and Stossel's involvement lacked support sufficient to permit a reasonable jury inference, we do not agree that they were so without circumstantial foundation as to have been frivolous. Cordoba presented evidence that Stossel was aware of her condition, and only Groo's and Stossel's own testimony indicated that Stossel neither conveyed this information to Groo nor actually participated in the decision to fire Cordoba. Likewise, although we agree that Cordoba's constructive knowledge theory was fundamentally flawed, we must also admit that it has support in prior dicta of this court. As such, Cordoba's claims were not "frivolous, unreasonable, . . . without foundation," or "groundless" under the <u>Christiansburg</u> standard, 434 U.S. at 421, 422, 98 S. Ct. at 700, 701, and it was therefore an abuse of discretion for the district court to award Dillard's fees and expenses on this basis.

IV.

As a postscript, we note that Dillard's might have avoided much of the expense of defending Cordoba's claims had it conducted this litigation differently. By our calculations, it appears that more than $75,000 of the fees and expenses awarded were incurred before Groo's deposition was completed. Moreover, more than $50,000 in fees were related directly to discovery regarding Cordoba's

37

alleged disability, another $23,000 was expended procuring expert testimony regarding her condition, and the bulk of Dillard's memorandum of law in support of its motion for summary judgment focused on the question whether Cordoba's heart condition was a disability under the ADA. All this work ultimately proved unnecessary. At the summary-judgment stage, the district court did not consider the "voluminous and conflicting record of expert medical testimony and related documents" the parties had compiled because it simply assumed the Cordoba was disabled and focused instead on Groo's lack of knowledge. Cordoba, 2003 WL 21295143, at *8. And when it ruled on Dillard's motion for fees and expenses, the court stated that it had still "only cursorily reviewed the medical evidence concerning whether [Cordoba] was disabled." Cordoba, 2003 WL 21499011, at *2 n.6.[13]

---

[13] Even if a fee award had been warranted in this case, we would have serious questions regarding the propriety of charging Cordoba with fees and expenses incurred in discovery related to her disability. Virtually all disability-related discovery was completed before Groo's deposition was completed, and the magistrate judge determined that Groo's lack of knowledge would not have been apparent to Cordoba until after Groo's deposition. In its report and recommendation, the magistrate judge stated that, as she understood the district court's order, the reason for this element of the award was that "there was insufficient evidence to show that Cordoba could ever reasonably have believed that she suffered from a disability, as that term is defined in the [ADA]." This implies, however, that Cordoba's case was frivolous from the outset, rather than that it merely became so once Groo's lack of knowledge was apparent. And if Cordoba's case was frivolous from the outset, she should have been responsible for the entire cost of defending it, not merely the fees and expenses relating to motions filed after Groo's deposition. But given that the disability issue presented an "exceedingly thorny question of fact" that the district court never addressed, Cordoba, 2003 WL 21295143, at *8, and that virtually all discovery related to that issue took place before Groo's lack of knowledge became apparent, we

Through its employees, Dillard's was aware of all facts regarding Groo's knowledge from the outset of this litigation. The primary basis for the district court's order granting summary judgment was (1) Groo's testimony that, prior to Cordoba's termination, she and Stossel never discussed Cordoba's heart condition or whether Cordoba should be fired and (2) Stossel's testimony to the same effect. If Dillard's thought that this deficiency in Cordoba's case was as glaring as the district court later concluded, one would have expected Dillard's to schedule any necessary depositions promptly and then move for summary judgment on this ground at an early stage in the proceedings.[14] At oral argument, we asked Dillard's counsel why they didn't do so. Counsel responded that they had proceeded with medical/disability-related discovery because "you only get to do one motion for summary judgment," and Dillard's wanted to be prepared to move for summary judgment on all available grounds. Of course, neither Federal Rule of Civil Procedure 56 nor the local rules for the Middle District of Florida limit a defendant to one summary-judgment motion; counsel, however, represented that

can see no reason for awarding Dillard's fees and expenses relating to that discovery.

[14] This observation is, of course, made in hindsight. We would not ordinarily fault a litigant for having failed to move for summary judgment at the precise point, identified after the fact, that such a motion would likely have been granted. But given that Dillard's now argues that Cordoba's case was completely frivolous, we think it is fair to ask in hindsight why Dillard's did not seek to bring this to the court's attention at an earlier point in time.

the district judge would not have ruled on any motion for summary judgment until after the deadline for filing all motions for summary judgment had passed.

We have significant doubts as to whether Dillard's is correct in its belief that the district court would have declined to rule promptly on such a motion for summary judgment—particularly if Dillard's had made clear to the court that the issue was straightforward, that Groo's lack of knowledge was dispositive, and that a prompt ruling on the motion would avoid medical discovery that would be time-consuming and expensive for both parties. While it is true that "district courts enjoy broad discretion in deciding how best to manage the cases before them," Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1366 (11th Cir. 1997), there is no reason to assume that a district judge will stubbornly refuse to rule on a motion for summary judgment at an early stage of the litigation if the moving party clearly apprises the court that a prompt decision will likely avoid significant unnecessary discovery. In fact, we expect that district judges will be open to such motions. See Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555, 91 L. Ed. 2d 265 (1986) ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive

determination of every action.'" (quoting Fed. R. Civ. P. 1)).[15]

If Dillard's is, in fact, correct that it absolutely could not have gotten heard on an early motion for summary judgment—that is, that the district judge has a per se rule against timely consideration of such motions—and, for that reason, Dillard's did not make such a motion, then the district judge's rigid way of disposing of cases caused much unnecessary discovery and expense. This case thus illustrates that such a rigid practice inevitably undermines several of the purposes of Rule 56, such as "to prevent vexation and delay, improve the machinery of justice, promote the expeditious disposition of cases." See 10A Charles Alan Wright et al., Federal Practice and Procedure § 2712 (2d ed. 2002) (footnotes omitted). But if, as we think is more likely, the district judge is somewhat more flexible than Dillard's represented at oral argument, then the

---

[15] Cf. Chudasama, 123 F.3d at 1368 (footnotes omitted):
    If the district court dismisses a nonmeritorious claim before discovery has begun, unnecessary costs to the litigants and to the court system can be avoided. Conversely, delaying ruling on a motion to dismiss such a claim until after the parties complete discovery encourages abusive discovery and, if the court ultimately dismisses the claim, imposes unnecessary costs. For these reasons, any legally unsupported claim that would unduly enlarge the scope of discovery should be eliminated before the discovery stage, if possible. Allowing a case to proceed through the pretrial processes with an invalid claim that increases the costs of the case does nothing but waste the resources of the litigants in the action before the court, delay resolution of disputes between other litigants, squander scarce judicial resources, and damage the integrity and the public's perception of the federal judicial system.

unnecessary cost and expense is attributable instead to Dillard's failure to move for summary judgment on the knowledge issue as soon as was practical—whether because it misjudged the district judge's likely response to such a motion or because Dillard's itself did not perceive Cordoba's claims to have been as frivolous as it now argues they were.[16]

## V.

For the foregoing reasons, the judgment of the district court requiring Cordoba to pay Dillard's $10,000 in attorney's fees and expenses, and requiring Dempsey to pay Dillard's $191,339.95 in attorney's fees and expenses is

REVERSED.

---

[16] On this point, we also note that Dillard's memorandum of law in support of summary judgment does not place particular emphasis on Groo's lack of knowledge. Dillard's first spent eleven pages arguing that Cordoba's heart condition is not a disability under the ADA. It then spent two-and-a-half pages addressing Groo's knowledge. It then spent four pages defending its stated reason for firing Cordoba as non-pretextual.