[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 06-15932
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 17, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-00892-CV-ORL-31-JGG

KEVIN H. HUDSON, an individual,

                                                                    Plaintiff,

BASYLE J. TCHIVIDJIAN,
THE LAW FIRM OF LANDIS GRAHAM FRENCH,  P.A.,
CRAIG L. BERMAN,
BERMAN LAW FIRM,  P. A.,

                                                    Interested Parties-Appellees,

versus

INTERNATIONAL COMPUTER NEGOTIATIONS, INC.,
a Florida Corporation,

                                                                    Defendant-Appellant.
_____

Appeal from the United States District Court
for the Middle District of Florida
_____

**(September 17, 2007)**

Before DUBINA and MARCUS, Circuit Judges, and PROCTOR,* District Judge.

_____

    * Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

MARCUS, Circuit Judge:

International Computer Negotiations, Inc. ("ICN") appeals from a district court order denying sanctions under Title 28 U.S.C. § 1927, against attorney Basyle J. Tchividjian, his law firm Landis Graham French, P.A., attorney Craig L. Berman, and his law firm Berman Law Firm, P.A., for their conduct in representing a plaintiff in a wrongful discharge suit against ICN. After thorough review, we affirm.

I.

The essential facts and procedural history are these. This appeal regarding attorneys' fees sought under § 1927 arises out of the underlying wrongful discharge suit brought by Kevin Hudson ("Hudson") pursuant to the Florida Civil Rights Act of 1992, Fla. Stat. § 760, et seq. ("FCRA"), and § 510 of the Employee Retirement and Income Security Act, 29 U.S.C. § 1140 ("ERISA"), against his former employer, appellant ICN.

From May 1997 through November 2002, Hudson worked for ICN, a consulting and educational organization that advises and trains technology procurement professionals and others involved in negotiating large business transactions. Hudson served as the Director of CAUCUS, an operating division of ICN that serves as an association of technology procurement professionals with chapters throughout the country. CAUCUS membership provides access to quarterly educational meetings, online fora, conferences and seminars, and a

certification program, and Hudson's responsibilities included organizing these meetings and increasing membership. Hudson's at-will employment agreement contained a one-year non-compete clause as well as a ten-year non-disclosure clause. By the time of his termination, Hudson's benefits included short-term disability, whose premiums ICN paid for, as well as optional long-term disability, whose premiums Hudson would be responsible for if he elected that coverage.

ICN's founder and President, Joseph Auer III ("Auer"), testified in deposition that he was "generally aware of [Hudson's] business activities and performance" early in Hudson's tenure at ICN, and that "[a]lthough there were some aspects of his performance that I thought were not particularly strong and should have been done differently or better, Hudson had usually done acceptable work." In the fall of 2001, however, Hudson came under Auer's direct supervision. Auer testified that by late 2001 or early 2002 he realized that Hudson's performance fell "far below what I expected and required." Auer began to object to several aspects of Hudson's performance. Hudson acknowledges that Auer repeatedly expressed dissatisfaction over these issues, although he defended his performance against Auer's critiques and argued that Auer's method of voicing criticism was abusive.

All parties agree that Auer and Hudson's relationship began to deteriorate at this point. However, although Auer would often object to Hudson's performance, sometimes in front of other employees, Auer indicated on more than one occasion,

3

when asked by Hudson, that he did not want Hudson's resignation. Instead, Auer assured Hudson that he was a "valuable member of the team." Moreover, in August 2002, in anticipation of taking a sabbatical from ICN, Auer created an Executive Committee to run the company in his absence. Auer included Hudson on the committee, and gave each member of the committee a raise. Hudson also generally received annual raises during his time at ICN. Nevertheless, a few months before his termination in November 2002, Hudson began seeking alternative employment because he was not happy at ICN under Auer's supervision.

On or about September 6, 2002, Auer was entering ICN's offices while Hudson was leaving. Auer asked Hudson where he was going, and noted that Hudson had been leaving the office often. At Hudson's request, they proceeded to Auer's office, where Hudson explained that he was seeing a psychologist and a psychiatrist for depression, and that he had chosen providers close to ICN's offices so that he would not have to take much time off. According to Hudson, Auer said that he understood and that he was supportive. Both agree that the brief conversation ended there.

In early October, Auer asked Hudson how he ensured that new CAUCUS members were made aware of the "list serve" ICN provides, which allows members to communicate with each other and share ideas. According to Auer, Hudson said that it had been his longstanding practice to have his assistant, Bonnie

4

Whitaker ("Whitaker"), contact each new member and explain the list serve to him or her. When Auer later questioned Hudson's assistant about this practice, she was at first evasive, but eventually confessed that Hudson had only recently told her to begin contacting new members to tell them about the list serve, that no one had previously been doing so, and that Hudson had further instructed her that if Auer asked, to tell him that she had been engaged in the practice for a long time. Auer testified that "[i]nstructing an employee to lie to me was the last straw," and he decided to fire Hudson. However, Auer says that he decided to wait to fire Hudson until after the conclusion of what was at that time the biggest event ICN had produced -- the annual CAUCUS conference scheduled in New Orleans for the third week of October 2002, all aspects of which Hudson was responsible for organizing and producing.

Although Auer concedes that the conference "went well overall," and that "certainly Hudson put lots of work into it," Auer observed "additional issues . . . with Hudson's performance" that confirmed his decision to terminate Hudson for poor performance. However, Hudson and Auer did not see each other after the conference until Auer fired Hudson on November 12.

Prior to that, in the weeks leading up to his termination, Hudson approached ICN's Chief Financial Officer Daniel Wallace ("Wallace"), who was responsible for certain human resources tasks, about insurance questions he had concerning some of the employees working under Hudson. Wallace apparently did not have

5

ready answers to each of Hudson's questions at that time.

ICN's office manager, Deborah Rosenblum ("Rosenblum"), testified that during "the latter part" of Hudson's time at ICN, he confided to her that he was in counseling for job-related pressures, including the way he believed he was being treated by Auer, and that he was being treated for depression. Hudson says he confided in Rosenblum because she had confided in him about a similar situation affecting someone close to her, because she "kept track of where everyone was [so] I needed to tell her that I would be going out," because he "needed someone in the office to know what was going on, just because of the nature of the situation," and because "she was the benefits coordinator, . . . so [it was] kind of hard to hide anything from that person."

On October 28 and again on November 4, Hudson asked Rosenblum for a copy of his long-term disability policy or for detailed information about what disability benefits he had. On both occasions she said that she did not have that information, and that Hudson would have to obtain it from the insurance carrier itself. On November 5, the insurance company faxed to Hudson's home one page from his long-term disability policy concerning a mental illness/mental health provision. There is no indication from the fax itself that it was copied to anyone else, and Hudson did not share it with anyone at ICN.

On November 5 or 6, Wallace passed Hudson in the ICN offices and indicated that he would get back to him about an insurance question, which he did

6

not more specifically describe.

On November 12, 2002, the first time Auer saw Hudson after the October conference, Auer personally terminated Hudson. Auer testified that he was the sole decision-maker. Auer explained that he "discussed with [Hudson] that things were just not working out," and Auer listed some of the performance issues that had been troubling him since late 2001 or early 2002. Auer said that "the conversation was actually pretty amicable and business-like," and that Hudson "broached the subject of his buying CAUCUS from ICN." Hudson agrees that he may have broached the idea.

On November 21, 2002, Hudson met with his attorney, Tchividjian, for the first time to seek legal advice concerning his ability to procure unemployment compensation, although he also mentioned that he was suffering from depression and had been terminated just several days after asking Rosenblum about his long-term disability insurance policy. Shortly thereafter, about one month after his termination, Hudson filed for and received unemployment benefits.

Between late November 2002 and mid-January 2003, Hudson and ICN engaged in protracted severance negotiations that grew contentious. On December 11, 2002, Wallace sent Hudson a letter reminding him of his obligation to adhere to the non-compete and non-disclosure provisions of his employment agreement, and warned that ICN would take any action necessary in response to a violation of this agreement. On January 17, 2003, Hudson responded that he was "not subject

7

to any such agreement," that in fact he "may be engaging in employment or ownership in the technology arena," and likewise warned that he would take "all action . . . necessary" to prevent ICN from inhibiting him. On January 30, 2003, Hudson and attorney Tchividjian met again, this time to discuss Hudson's severance negotiations with ICN. Although they discussed the legal claims Hudson might have against ICN, Tchividjian advised that corroborating evidence was needed.

In March 2003, after turning down multiple job offers, Hudson started his own business, Technology Procurement Education Network, Inc. ("TPEN"). In mid-2003, ICN learned about TPEN, and on July 17, 2003, ICN sued Hudson in the Circuit Court for the Ninth Judicial Circuit, in Orange County, Florida, to enforce the non-compete, non-disclosure, and confidentiality clauses of his employment agreement.

On August 29, 2003, Tchividjian, who had not met with Hudson since January, filed an answer on Hudson's behalf. In his affirmative defenses, Hudson alleged for the first time -- nearly ten months after his termination -- that he had been unlawfully terminated because of a disability. Sometime between August and November, Hudson called Tchividjian to inform him that he had located the fax sent directly from the insurer to Hudson's home containing the portion of his insurance plan pertaining to his long-term disability benefits. In November 2003, about a year after Hudson's termination, Tchividjian filed a complaint on Hudson's

8

behalf with the Florida Commission on Human Rights, alleging that ICN's termination of Hudson constituted discrimination on the basis of disability.

Nineteen months after his termination -- on June 10, 2004 -- Tchividjian filed this suit against ICN on Hudson's behalf in the United States District Court for the Middle District of Florida, alleging that Auer terminated him because of his depression, which he said constituted a disability, in violation of the Florida Civil Rights Act of 1992, Fla. Stat. § 760, et seq. ("FCRA"), and in order to deprive him of long-term disability benefits, in violation of § 510 of the Employee Retirement and Income Security Act, 29 U.S.C. § 1140 ("ERISA").[1]  Hudson also brought a claim under Florida common law, alleging that ICN negligently misrepresented that he would not be fired in the months leading up to his termination.  The complaint also claimed that Auer's abuse in the workplace was the cause of Hudson's depression.

As the district court would later find in its first sanctions order, "ICN was forced to file three separate motions to compel the production of documents, complete answers to interrogatories, and Rule 26 disclosures."  Despite the fact

---

[1] Section 510 of ERISA provides, in relevant part:

> It shall be unlawful for any person to discharge . . . a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

29 U.S.C. § 1140.

that the district court granted each of these motions, Hudson failed to comply with at least one of them, forcing ICN to file yet another motion to compel compliance with the court's order, which the court granted and pursuant to which it awarded attorneys' fees to ICN.

ICN subpoenaed Hudson's mental health records, which Hudson did not have and which Tchividjian had not reviewed prior to filing the lawsuit. They revealed that Hudson had been seeing a mental health professional well before he began working for ICN, that during all times of treatment Hudson had been able to work, and that his psychiatrist believed Hudson to be a capable person. As the district court would later find, the conflicting evidence on this issue showed that Hudson had suffered "major depression" prior to his termination, but had not been "clinically depressed" at the time of his termination. In any case, the court determined, there was no evidence that Hudson's depression substantially limited his ability to work, and the evidence showed that Hudson was, at the time of this suit, able to "fully function in life."

Tchividjian took several depositions, most of which failed to support Hudson's claims. Rosenblum testified that she had not mentioned Hudson's inquiry to anyone, including Auer and Wallace. Wallace testified that in his November 5 or 6 comment to Hudson indicating that he would get back to him about an insurance question, he was referring to one of the questions Hudson had asked him about an employee under Hudson's supervision, and that he had no

10

knowledge that Hudson had made any insurance-related inquiries about himself or that Hudson was receiving any sort of counseling or treatment for depression. Auer testified that he had no knowledge that Hudson had inquired about his long-term disability benefits, and that he did not view Hudson as being disabled based on the single comment Hudson made to him indicating that he was seeing a professional for depression. Auer observed that he alone made the decision to fire Hudson when, after what he considered to be a year of substandard performance, he learned that Hudson had asked Whitaker to lie to him. Finally, although by the time of her deposition she herself had been terminated by ICN, Whitaker confirmed that Auer had repeatedly "raised issues with Hudson" about his performance, that Hudson had instructed her to lie to Auer, and that when Auer learned of the fabrication he became "very upset."

The only testimony to support Hudson's case came in the form of an affidavit submitted by former ICN employee Lara Proctor, Hudson's executive assistant beginning in May 2000. Proctor swore that "[e]veryone in the office knew that [Rosenblum]'s primary role at ICN was to keep [Auer] informed about what was going on in the office . . . . Based upon prior experiences, we were all aware that whatever was shared with [Rosenblum] would be subsequently communicated to [Auer]. There is no doubt that [Rosenblum] would have told [Auer] that [Hudson] was seeking information on both short and long term disability."

11

ICN moved for summary judgment on all three counts, arguing that, as for the ERISA claim, the evidence showed that Auer alone made the decision to terminate Hudson, that he was not aware of Hudson's inquiry regarding long-term disability, and that as for the FCRA claim, the evidence showed that Hudson's alleged depression had not come close to substantially impairing a major life activity. In sum, ICN argued that Hudson could not make out a prima facie case under either statute, and that even if he could, ICN had shown legitimate non-discriminatory reasons for his termination. ICN also argued, with respect to the negligent misrepresentation claim, that Hudson could not have relied to his detriment on anything Auer told him because the evidence showed that Hudson had been actively seeking alternative employment months before his termination.

Hudson and Tchividjian arranged for Berman to prepare Hudson's response to ICN's motion for summary judgment. That response abandoned the negligent misrepresentation claim. It did, however, oppose summary judgment as to his claims under ERISA and the FCRA, arguing that a genuine issue of material fact existed concerning Auer's knowledge of Hudson's inquiry to Rosenblum; that his depression had substantially limited his ability to interact with others and concentrate, his emotional stability, his sexual drive, and his ability to sleep; and that even if Hudson was not disabled, Auer had terminated Hudson based on his perception that Hudson was disabled. Berman also argued generally that the

12

undisputed facts harmful to Hudson's claims must be disregarded because they came from the testimony of interested parties.

The district court granted summary judgment to ICN on all counts. As for the ERISA claim, the court found that Hudson could not show that Auer, the sole decision-maker, "had the specific intent to interfere with [Hudson's] ERISA rights," which is the "'ultimate inquiry in a § 510 case.'" Order at 8-9 (quoting Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1222-23 (11th Cir. 1993)). The district court concluded that the "best" Hudson could do was offer his "unsupported assumption" that Rosenblum told Auer of Hudson's request concerning long-term disability -- an assumption the court said was "further weakened by evidence . . . showing that Rosenblum did not inform anyone . . ., and that Auer was not aware of that request prior to Hudson's termination."

As for the FCRA claim, the court found that Hudson could not show that his depression substantially limits a major life activity, in particular, his ability to work, nor had Hudson established that he was regarded as being impaired. Instead, the court found that both before and after his termination, Hudson engaged in a successful job search and started his own company. The court concluded:

> Hudson has utterly failed to support his claims under both ERISA and FCRA. Particularly given the circumstances of this case and the timing of this suit, it appears that this suit is little more than a retaliatory action by Hudson in response to ICN's suit regarding the non-compete agreement. Indeed, these circumstances, combined with Hudson's utter inability to support his claims[,] make his claims appear little more than frivolous.

13

Counsel Tchividjian timely filed a notice of appeal and Berman prepared and filed Hudson's appellate brief in which he made essentially the same arguments he presented in his opposition to summary judgment. In a brief, unpublished per curiam opinion, a panel of this Court affirmed without oral argument, agreeing with the district court that Hudson's "utter inability to support his claims" made them "little more than frivolous." No. 05-16738 (11th Cir. Apr. 28, 2006). ICN then moved for attorneys' fees against Hudson and his attorneys under § 1132(g)(1) of ERISA, § 760.11(5) of the FCRA, and 28 U.S.C. § 1927. By separate order, we granted ICN's unopposed motion to transfer consideration of appellate attorneys' fees to the district court. See No. 05-16738 (11th Cir. July 5, 2006).[2]

On remand, the district court considered ICN's motion as to both district court and appellate attorneys' fees under ERISA, the FCRA, and § 1927 against Hudson, Tchividjian, and Berman. Berman filed one opposition on his own behalf and a second one on Hudson's behalf, both of which relied on this Court's decision in Cordoba v. Dillard's, Inc., 419 F.3d 1169 (11th Cir. 2005). Tchividjian filed an opposition on his own behalf.

On July 20, 2006, the district court entered its first order on this issue which,

_____

[2] At various points during both the trial and appellate court proceedings, Tchividjian offered to drop this case if ICN would drop the state claim, with neither party receiving any attorneys' fees in either action.

14

among others, assessed attorneys' fees against lawyers Tchividjian and Berman personally under § 1927. The court concluded:

> While no one consideration, standing alone, would be sufficient for the Court to impose sanctions under Section 1927, the Court finds that in combination, the frivolous nature of the claim, Hudson's retaliatory motive, counsel's handling of the case particularly as it relates to discovery, and the continued efforts to support the claims in the face of both a lack of supporting evidence and clear evidence to the contrary, warrant the imposition of sanctions.

As for "the frivolous nature of [Hudson's] claim," the district court said that it "was able to make clear findings of fact" from the evidence produced through discovery, and that several of the arguments Hudson made in response to ICN's motion for summary judgment "def[ied] any semblance of logic." Specifically, the district court found, with respect to Hudson's ERISA claim, that the evidence did not support the claim that Auer knew of Hudson's request for long-term disability benefits information. The evidence "distinctly demonstrate[d]" that Rosenblum, "the only person with whom Hudson spoke about his benefits, did not advise Auer of Hudson's request." Nor was Hudson warranted in his "attempts to infer from Wallace's purported knowledge of Hudson's request for benefits information that Auer also was aware of Hudson's request."

As for Hudson's FCRA claim, the district court found that Hudson had produced "no evidence" that his depression "substantially limited his life activities," which was necessary to support his claim that he is disabled within the meaning of the FCRA. Nor, the court found, could Hudson save his FCRA claim

15

by arguing that Auer discharged him because of a perceived disability; the "clear evidence" showed "that Auer terminated Hudson because of dissatisfaction with various aspects of Hudson's performance," rather than because of "Hudson's admission [to Auer] that he suffered from depression."  The district court concluded that although "Hudson's claims were questionable at best when they were made," and then "discovery revealed (or should have revealed) an almost complete lack of factual support for his claims, Hudson and his counsel nevertheless pressed on, attempting to create argument to support their untenable position."  The district court also imposed § 1927 sanctions for Hudson's appeal to this Court, noting that he "raised virtually the same argument before [us] as those presented to [the district court]."

Tchividjian moved for reconsideration because the court appeared to have overlooked his brief and considered only Berman's briefs.  The district court granted the motion.  On July 31, 2006, this Court issued its opinion in Amlong & Amlong, P.A. v. Denny's, Inc., 457 F.3d 1180 (11th Cir. 2006), as amended Oct. 10, 2006, in which we noted that an attorney under the threat of § 1927 sanctions is entitled to an evidentiary hearing.  See id. at 1193.  Shortly thereafter, both Berman and Tchividjian asked for such a hearing.  The district court granted the application.

At the October 5, 2006, hearing, the district court noted that the hearing was being held, and the motion for reconsideration had been granted, in part in order to

consider whether its original order granting sanctions was incorrect under Circuit precedent found in Cordoba v. Dillard's, Inc., 419 F.3d 1169 (11th Cir. 2005). After the hearing, the court concluded that it had "no option but to vacate" its prior order, and refused to award § 1927 fees. The district court said that although it continued to believe that Hudson's case had been frivolous, it read Cordoba, which involved a similar fact pattern, as precluding § 1927 fees in this case.

The district court stated that other than a typographical error in its prior order, he had "no reason to change my findings, per se. I still think this case was frivolous. I don't think that there was ever any connection between the request for disability information and the termination by the decision maker." Tr. 52:2-6. In addition, the court noted, circumstantial evidence suggested "there is reason to believe" that the federal case was brought in retaliation for ICN's suing Hudson in state court, giving at least the appearance that "federal process was being used as leverage as opposed to being used on the merits." In particular, the temporal proximity of the filing of the two cases and Hudson's offer to settle the federal case in exchange for ICN dropping the state case were "cause for concern." However, the court expressly found that it had "no basis to get into the minds of the parties involved," and therefore "can't make a finding that it's so." Id. 52:14-17. Moreover, the district court said that it had only recently learned that Tchividjian's firm had taken the federal case on a contingency fee basis, which it found "tends to weigh against" a finding that the lawyers brought the case knowing that it was

17

frivolous and unlikely to succeed. Accordingly, the district court rejected an award of sanctions under § 1927.

As for the fees incurred pursuant to Hudson's appeal of the district court's grant of summary judgment in favor of ICN, the district court concluded that it was not "in a position to either legally or factually . . . determine sanctions from appeal." Id. 51:16-18. The district court stated that determining whether sanctions are justified for bringing a frivolous appeal is the job of the appellate court, not of the district court. The district court entered an order to that effect, citing the reasons stated in open court during the hearing, and noting that its decision came "particularly in light of the decision in Cordoba."

ICN appeals from the district court's final order. Its appeal is limited to the district court's refusal to assess attorneys' fees against Hudson's attorneys under § 1927.

II.

We review a district court's order under § 1927 for abuse of discretion. Cordoba, 419 F.3d at 1179. "An abuse of discretion occurs if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous." Id. at 1180 (internal quotations omitted). ICN does not dispute the district court's findings of fact. Instead, it argues that the district court made a legal error,

18

constituting abuse of discretion, in interpreting Cordoba as having created a per se

bar to § 1927 sanctions in certain categories of cases. See App. Br. at 21.

A. Sanctions for Conduct Related to the District Court Proceedings

Section 1927 provides, in pertinent part, that "[a]ny attorney . . . who so

multiplies the proceedings in any case unreasonably and vexatiously may be

required by the court to satisfy personally the excess costs, expenses, and

attorneys' fees reasonably incurred because of such conduct." Under the plain

language of the statute, then, in order for a court to justify sanctions, it must find

that three conditions apply:

> First, the attorney must engage in "unreasonable and vexatious"
> conduct. Second, that "unreasonable and vexatious" conduct must be
> conduct that "multiplies the proceedings." Finally, the dollar amount
> of the sanction must bear a financial nexus to the excess proceedings,
> i.e., the sanction may not exceed the "costs, expenses, and attorneys'
> fees reasonably incurred because of such conduct."

Peterson v. BMI Refractories, 124 F.3d 1386, 1396 (11th Cir. 1997). An

attorney's conduct meets the first of these conditions "only when the attorney's

conduct is so egregious that it is tantamount to bad faith." Amlong & Amlong, 457

F.3d at 1190 (internal quotation marks and citation omitted). "[A]n attorney's

conduct must be particularly egregious to warrant the imposition of sanctions -- the

attorney must knowingly or recklessly pursue a frivolous claim . . . ." Id. at 1193.

"[N]egligent conduct, standing alone, will not support a finding of bad faith under

§ 1927 . . . . For sanctions under section 1927 to be appropriate, something more

19

than a lack of merit is required." Id. at 1193 (internal quotation marks and citations omitted).

While an attorney's conduct must be tantamount to bad faith, "for purposes of § 1927, bad faith turns not on the attorney's subjective intent, but on the attorney's objective conduct." Id. at 1190. What is crucial is whether, regardless of the attorney's subjective intentions, the conduct was unreasonable and vexatious when measured against an objective standard. Id. "That is not to say the attorney's purpose or intent is irrelevant. Although the attorney's objective conduct is the focus of the analysis, the attorney's subjective state of mind is frequently an important piece of the calculus, because a given act is more likely to fall outside the bounds of acceptable conduct and therefore be 'unreasonabl[e] and vexatious[]' if it is done with a malicious purpose or intent." Id. at 1192.

ICN argues that the district court committed legal error constituting an abuse of discretion by reading Cordoba as setting a "per se bar" against § 1927 sanctions in a wrongful discharge case whenever an employer's actual knowledge is disputed. We do not read the district court's statements on the record at the conclusion of the evidentiary hearing as interpreting Cordoba in this way, although we agree with ICN that such an interpretation of Cordoba or any of our § 1927 cases would be erroneous. As we reiterated in Cordoba itself and have had occasion to stress before, "'[d]eterminations regarding frivolity are to be made on a case-by-case basis.'" Cordoba, 419 F.3d at 1177 (quoting Sullivan v. Sch. Bd. of

20

Pinellas County, 773 F.2d 1182, 1189 (11th Cir. 1985)) (emphasis added). But, even if the district court had read Cordoba as imposing a per se rule, we would still affirm because under the strikingly similar facts of Cordoba, the attorney conduct here was not "so egregious that it is tantamount to bad faith." Amlong & Amlong, 457 F.3d at 1190.

In that case, Cordoba sued her former employer, the department store Dillard's, for wrongful termination on the basis of disability, in violation of the ADA and the FCRA. 419 F.3d at 1172. After the district court granted summary judgment in favor of Dillard's on all counts and we affirmed in an unpublished opinion, Dillard's sought attorneys' fees against both Cordoba and her attorney, Dempsey, under, inter alia, § 1927. Id. The district court granted the motion. However, Cordoba and Dempsey appealed, and we reversed. Id.

Cordoba was a sales associate at Dillard's, where she was one of about 250 employees. Id. Cordoba's direct supervisor was Stossel, the Area Sales Manager (ASM) in the area of the store where she worked. Id. Stossel's supervisor, in turn, was Groo. Id. One day in August 1998, Cordoba came to work wearing a "plainly visible" heart monitor to aid her doctor in diagnosing some heart issues she had been experiencing. At least one co-worker noticed it and discussed it with Cordoba. Id. at 1173. In May 1999, Cordoba had to leave work to go to the hospital because she had a heart episode. Id. In January 2000, she again had to leave work for the hospital because she had another episode. Id. At this time

21

Cordoba was finally diagnosed as suffering from a congenital heart disorder which caused her to have sporadic episodes of an erratic heartbeat, and for which she took medication that caused additional side effects. Id. Cordoba discussed her condition "with several of her colleagues on a number of occasions." Id. In March 2000, her doctor recommended surgery, which Cordoba scheduled for that summer. Id. at 1173-74.

Cordoba and Stossel discussed Cordoba's condition on at least a few occasions. Id. at 1174. Stossel knew of Cordoba's diagnosis, that she had scheduled surgery, and that she would need a couple of weeks off to recuperate. Id. At least once, Stossel noticed Cordoba sitting down on the job and Cordoba explained that she was having heart palpitations; Cordoba also reported to Stossel any time she needed to leave work because of an episode. Id. In March or April 2000, Cordoba asked Stossel for a reduction in hours and requested that she not have to work nights because her medication caused her fatigue. Stossel said it would take a while to fulfill those requests because doing so would require hiring another employee. Dillard's complied in about one month. Id.

Groo, on the other hand, had "very little contact with Cordoba" and would later testify that she had "no inkling" that Cordoba had any health problems. Id. In October 1998, Groo and Cordoba met about some unexcused absences and tardiness. Cordoba explained to Groo that she "had been sick and . . . was going to a lot of doctors' appointments and getting a lot of testing done," and that the

22

doctors had not yet determined what was wrong with her.  Id.

On June 17, 2000, a customer asked Cordoba to return a garment.  Id. at 1172.  Cordoba determined that she needed the approval of an ASM before accepting the return, and because Stossel was unavailable, she contacted Sebben, the ASM of another store area.  Sebben and Cordoba apparently had a heated exchange after which Sebben asked Cordoba whether she liked working at Dillard's.  Cordoba said that she hated Dillard's but continued working there for the insurance benefits, which she depended on.  Id. at 1172-73.  Sebben related the incident to Stossel two days later, and Stossen, in turn, related the story to Groo.  Id. at 1173.  Groo then asked Stossel and Cordoba to her office to discuss the matter.  Cordoba did not apologize for the remark, but did explain that she was being sarcastic in the face of what she perceived to be Sebben's verbal attack on her.  Groo told Cordoba that if she did not like her job, she could no longer work at Dillard's.  Cordoba says she tried to persuade Groo to reconsider, but Groo handed her her termination papers.  Id.

In September 2001, Cordoba sued Dillard's, alleging that she had been terminated because of her heart condition.  Id. at 1174.  The evidence showed that Cordoba's condition was not recorded anywhere in her personnel files; Groo and Stossel testified that they had never discussed her condition; and Groo was the sole decision-maker.  Id.  The district court granted summary judgment to Dillard's.  It found that there was a question of fact as to whether Cordoba was disabled, but

23

granted summary judgment because it found that Cordoba could not show that the sole decision-maker, Groo, was aware of her alleged disability. Id. The district court also "note[d] with concern that, quite apart from the question of what Defendant knew, there is serious reason to doubt even that Plaintiff considered herself to be disabled at any time during her tenure at Dillard's." Id. at 1175. In fact, in her application for unemployment benefits, she stated that she was not disabled. Id. Cordoba had made an alternative argument that Dillard's had "constructive knowledge" of her disability, which the district court rejected as making no sense without Groo first having actual knowledge. Id. Finally, Cordoba argued that Stossel's actual knowledge created institutional liability for Dillard's. Id. On appeal, we affirmed, rejecting each of Cordoba's theories of liability. Id.

The district court assessed fees, inter alia, against Cordoba's counsel under § 1927, finding that Dempsey's conduct was "tantamount to bad faith," as required by our case law construing the statute. Id. at 1177-78. Specifically, the trial court found that attorney Dempsey had acted in "reckless disregard" of a "serious defect" in Cordoba's case: Groo's lack of knowledge of her alleged disability. Id. at 1178. The court determined that Cordoba's actual knowledge theory had no basis in fact, while her constructive knowledge theory had no basis in law, and that at some point, counsel obviously grasped these defects, yet instead of retreating from a frivolous suit through voluntary dismissal or settlement, he pushed on

24

through summary judgment.  Id.

Reviewing for an abuse of discretion, we reversed the sanctions order.  Id. at 1172, 1179.  We found that Cordoba had raised three theories of liability, two of which are relevant here.  Id. at 1180.  We agreed that the evidence "fell far short of creating a genuine issue" as to the first theory -- that Groo had actual knowledge.  Groo and Cordoba discussed her medical issue only once, more than a year prior to the termination, when Groo asked about unexcused absences.  Id.  Moreover, the content of this one conversation itself, we said, "could not have put Groo on notice that Cordoba was disabled"; Cordoba merely mentioned an undiagnosed health issue causing her lots of problems.  Id.  Yet while we found that Cordoba's case was  "pure conjecture" and "exceedingly weak on this point, it was not so weak as to make it frivolous for her to argue that Groo's knowledge of her disability presented a triable issue of fact," because "the context of her dismissal at least ma[de] her speculation" not entirely "unreasonable."  Id. at 1181.  Specifically, we noted, Stossel had been generally aware of Cordoba's condition for some time, as were several other employees, so that "although Cordoba could ultimately do no more than speculate that Groo was aware of her condition, this speculation was not so unreasonable that it can be termed frivolous," and "decisive facts may not emerge until discovery or trial."  Id. at 1181-82.

We then turned to Cordoba's second theory of liability -- that Stossel had actual knowledge and participated at least to some extent in the termination

25

decision. Again, while Cordoba could only speculate that Stossel, with her actual knowledge, was involved in the termination decision, and although Stossel and Groo both denied that this was the case, we held that it was not "entirely unreasonable for Cordoba to hope that the court would permit her case to go to a jury on this theory." After all, "only Groo's and Stossel's own testimony indicated that Stossel neither conveyed this information to Groo nor actually participated in the decision."

We also made the general observation that Cordoba was "a competent employee" whose work performance Dillard's had described as ranging from "average" to "good," and that Sebben herself was surprised to learn that Cordoba had been fired as a result of the incident. Id. at 1186. In short, although we agreed that "Cordoba's allegations regarding Groo's knowledge and Stossel's involvement lacked support sufficient to permit a reasonable jury inference," we held that they were not "so without circumstantial foundation as to have been frivolous." Id. at 1187.

Similarly, in this case, precious little evidence allowed an inference that the sole decision-maker knew of the alleged disability, much less that Auer fired Hudson because of that disability. Hudson had only one conversation with Auer about his health issues (admittedly only about nine weeks prior to the termination). Hudson initiated this conversation in order to explain his absences from work, and briefly mentioned that he was seeing a counselor for depression. Hudson did not

26

indicate that he would need any accommodations for his depression or otherwise suggest that his depression rose to the level of a disability.

Moreover, although Hudson, like Cordoba, could only "speculate" that Rosenblum or Wallace had told Auer about his insurance inquiries, ICN was a much smaller office than Dillard's, and much of Rosenblum's job was to keep Auer apprised of such things, so that this assumption, while ultimately unproven, was not altogether unreasonable, especially where another former ICN employee expressly testified that the ICN office manager "would have told" Auer about Hudson's inquiry regarding his long-term disability benefits.

Finally, in the instant case, although Auer had for months criticized Hudson for various performance issues, Auer always assured Hudson that he was a valuable member of the team whom he wanted to retain. Moreover, Hudson had received regular annual raises throughout his tenure at ICN, and less than three months before Auer terminated him, Auer appointed Hudson to an executive committee to help run ICN in Auer's absence. The turning point in Auer's decision to retain Hudson apparently came when Auer learned that Hudson had instructed Whitbeck to lie to Auer. Hudson, however, seemingly did not realize that the lie had been uncovered. As a result, it may have reasonably appeared to Hudson that his termination was instead motivated by either or both of two protected activities undertaken in very close proximity to his termination: (1) his disclosure to Auer that he was being treated for depression (some nine weeks prior

27

to his termination); and (2) his request concerning long-term disability (a mere eight days prior to his termination).  See Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.").  In short, while Hudson's case was weak, it was not "so without circumstantial foundation" as to render it frivolous under Cordoba's very similar fact pattern.

Alternatively, Hudson's case would have been frivolous if it had been brought, as ICN claims, solely to harass ICN in retaliation for ICN's state court suit against Hudson.  However, in its final order denying sanctions, the district court specifically stated that it could not (and did not) find as a matter of fact that Hudson or his attorneys had been motivated by retaliation to any extent, much less that retaliation constituted the sole purpose for bringing the lawsuit, noting that the circumstantial evidence pointed in both directions.

In sum, the district court made thorough findings of fact and ultimately concluded that those facts are sufficiently close to Cordoba's as to preclude an award of § 1927 sanctions against Hudson's attorneys.  On this record, we can find no abuse of discretion on the part of the district court.

B.  Sanctions for Conduct Related to the Appellate Proceedings

On December 2, 2005, Hudson timely filed a Notice of Appeal from the

28

district court's grant of summary judgment to ICN. On December 7, ICN filed a motion in the district court asking, among other things, that attorneys' fees be assessed against attorney Tchividjian pursuant to § 1927. On January 11, 2006, the district court denied ICN's motion without prejudice, noting that ICN could bring the motion again at the conclusion of Hudson's appeal.

On April 28, 2006, this Court issued its opinion affirming the district court's grant of summary judgment for ICN, agreeing that Hudson's case was "little more than frivolous," and we taxed costs on appeal against Hudson. On May 16, ICN timely filed a motion with this Court, pursuant to Eleventh Circuit Rule 39-2(d),[3] to transfer consideration of the issue of appellate attorneys' fees to the district court. The motion recites that both the district court and this Court had, in respectively granting and reviewing the order of summary judgment in favor of ICN, agreed that Hudson's case was "little more than frivolous." ICN's motion also indicated that it planned "to seek an award of attorneys' fees for the appeal on the same statutory grounds in which it will renew its motion with the District Court upon remand." However, ICN did not indicate what those statutory grounds were. On June 16, ICN refiled its motion for attorneys' fees in the district court, this time asking that § 1927 fees be assessed against not only Tchividjian, but also Berman, as Hudson's appellate counsel. On July 5, we granted ICN's Rule 39-2(d) motion

---

[3] That rule provides: "Any party who is or may be eligible for attorney's fees on appeal may, within the time for filing an application provided by this rule, file a motion to transfer consideration of attorney's fees on appeal to the district court . . . from which the appeal was taken."

to transfer consideration of appellate attorneys' fees to the district court.

In its first sanctions order, the district court awarded § 1927 appellate attorneys' fees to ICN. On reconsideration, however, the court stated that it was not "in a position to either legally or factually . . . determine sanctions from appeal," and vacated that portion of its prior order. ICN now asks us to hold that the district court has jurisdiction to consider appellate attorneys' fees under § 1927. We cannot do so.

If ICN had wished to seek fees for a frivolous appeal, it was required to do so "no later than the filing of [its] brief," Eleventh Circuit Rule 38-1, pursuant to Federal Rule of Appellate Procedure 38: Frivolous Appeal -- Damages and Costs.[4] ICN failed to do so. Rule 39-2(a) expressly forbids litigants from seeking appellate attorneys' fees on grounds of frivolousness under Rule 39: "For purposes of this rule, the term 'attorney's fees' includes fees and expenses authorized by statute, but excludes damages and costs sought pursuant to FRAP 38 . . . ." Therefore, while we transferred consideration of "attorneys' fees" to the district court, our order could not have applied to appellate attorneys' fees sought under § 1927 for frivolous lawsuits -- the only kind of fees at issue in this appeal. Nor was ICN permitted to ask the district court, in the first instance, to assess appellate fees under § 1927.

---

[4] Rule 38 provides: "If a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee."

At all events, even if we had given the district court the power to assess appellate fees under § 1927, we think it is clear from the district court's final order denying § 1927 sanctions for Tchividjian's conduct before it that it would reach the same result with respect to Berman's conduct on appeal. In its first sanctions order, the district expressly found that "[o]n appeal, Hudson raised virtually the same arguments before the Eleventh Circuit as those presented to this Court."

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.