[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-14217

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 09, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-02441-CV-TWT-1

BACHIR MIHOUBI,

Plaintiff-Appellant,

versus

CARIBOU COFFEE COMPANY, INC.,
MICHAEL COLES,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(July 9, 2008)**

Before EDMONDSON, Chief Judge, PRYOR and KRAVITCH, Circuit Judges.

PER CURIAM:

Bachir Mihoubi appeals from a summary judgment ruling in favor of his

former employer, Caribou Coffee Company, and Caribou's CEO, Michael Coles, in this 42 U.S.C. § 1981 discrimination suit. The district court held that Mihoubi failed to sufficiently rebut the defendants' proffered legitimate reason for terminating him or to demonstrate a nexus between his termination and his complaints of discrimination to establish a claim for retaliation. For the reasons stated below, we affirm.

## BACKGROUND

Caribou hired Mihoubi as Vice President of Global Franchising in 2003.[1] Coles contends that there were problems with Mihoubi's performance from the start. At Mihoubi's deposition, Caribou introduced one email from Coles to Mihoubi sent May 7, 2004 wherein Coles chastised Mihoubi for mistakes that required extra work from other Caribou employees to compensate for Mihoubi's errors and for his inability to produce a business plan without the help of other employees. In the email, Coles stated, "It is clear to me, that you have never been in a position like this before . . . There is no officer in this company that I have tried to help more, or have given more guidance and patience. I expected a lot more depth and a lot more knowledge of the functionality of this department." Also, Coles completed an annual review for Mihoubi dated February 9, 2005

---

[1] At the time he was hired, Caribou was a private company owned by an organization with Muslim ties and operating in compliance with Muslim rules known as laws of Shari'ah.

which was, at best, mixed. In that review, Coles stated that Mihoubi "oversold himself," lacked experience, needed a more disciplined approach, and that his continued refusal to move to Minneapolis was a "major problem."[2] The review, however, also stated that Mihoubi excelled in "service orientation" and had successfully accomplished a large deal with a Middle East partner and had accomplished that goal "at a level economically that far exceeded [Caribou's] expectations." This review was not signed by either Mihoubi or Coles, despite signature lines for both. Coles asserts that signatures were omitted frequently from performance reviews; Mihoubi claims he never received this evaluation.

Mihoubi, on the other hand, contends that his performance was well-received at Caribou until Amy O'Neil was promoted and Mihoubi began reporting to her. In 2004, Mihoubi worked on and finalized a large deal (the "Al-Sayer deal") to open a number of Caribou franchises in the Middle East. In March 2004 Mihoubi was given a $100,000 bonus in recognition of his accomplishments on the Al-Sayer deal. This bonus represented 50% of Mihoubi's annual salary and was the largest bonus Caribou had given to anyone other than a CEO or President, although it was less than the $325,000 Mihoubi had requested. Mihoubi also received a 4.5% increase in his annual salary. Also in 2004, Coles gave Mihoubi a

---

[2] Caribou's headquarters were in Minneapolis, but Caribou allowed Mihoubi to work out of an Atlanta office.

3

rating of "1B" on his annual performance review.[3] Coles gave O'Neil the same 1B rating in her annual review and referred to her as a "superstar" who had "exceeded all of [Coles'] expectations."

The concrete problems Caribou raised concerning Mihoubi's work performance started in the spring of 2005. In addition to its claim that Mihoubi performed poorly from the beginning, Caribou cited two major failures by Mihoubi starting that spring. Coles and O'Neil asked Mihoubi to create a multi-year business plan, which he failed to do to their satisfaction. Mihoubi also failed to deliver background financial information on the Fong Tat group, a potential franchisee in Singapore.

Regarding the business plan, O'Neil testified in her deposition that she had to badger Mihoubi repeatedly to get him to prepare and present a business plan, and that when he finally did present his plan it was too short (Mihoubi planned only one half hour to present the plan which she found inadequate), too non-specific, and insufficiently supported by data. O'Neil also stated that Mihoubi made it difficult to set up the meeting to present the plan because he canceled one meeting at the last minute and was generally unavailable. Mihoubi responded that he was never asked to produce a business plan prior to March 2005 other than one

---

[3] This evaluation was also not signed by either Mihoubi or Coles.

he presented at the beginning of his employment in 2003. Mihoubi also asserted that he did prepare a business plan and tried to present the plan to O'Neil at their meeting on June 7, 2005. According to Mihoubi, O'Neil prevented him from presenting his plan at that meeting by interrupting him argumentatively, yelling at him, and cutting the meeting short. Mihoubi also contends that a half hour was adequate because, in his experience, business executives generally do not want to listen for longer than that time period.

Mihoubi also disputes Caribou's assessment of his work on the Fong Tat group. Mihoubi claims that the Fong Tat deal had already been established through an earlier letter of intent, and thus, his analysis of the Fong Tat group's financial stability was unnecessary.

Mihoubi contends that O'Neil and Coles manufactured these pretextual reasons for firing him because of their dislike for Middle Eastern Arabs. Mihoubi provided evidence of derogatory comments made by both O'Neil and Coles regarding Arabs and Muslims. Tom Berzinski, former Vice President of Real Estate and Store Development for Caribou, testified in his deposition that O'Neil had commented to him that "she did not feel comfortable having someone like that reporting to her" after she interviewed a potential employee of Middle Eastern descent. Berzinski understood this comment to refer to Middle Easterners.

Berzinski told O'Neil that she "can't say something like that," to which O'Neil responded "It's just you and I talking Tom." According to Christopher Toal, former Vice President of Marketing at Caribou, O'Neil said at a senior staff meeting that she could not wait to get the Muslim ownership of Caribou behind them because she did not like being involved with "those guys." Toal understood her to mean Muslims. Toal testified in his deposition that O'Neil and Coles made other derogatory comments about Arabs at that meeting, although he could not remember the specific comments.

Mihoubi also produced evidence of anti-Arab statements made by Coles. Toal testified that Coles expressed reluctance at returning to Bahrain because he was not looking forward to dealing with "those guys" which Toal believed referred to Arabs and Middle Easterners. Mihoubi testified that when he offered to write a card in Arabic for Coles to send to an Arab executive for a Muslim holiday, Coles responded that he could not believe that he (Coles) was lowering himself to this level. Mihoubi also testified that Coles made fun of the way men were dressed when he and Mihoubi were on a business trip in Bahrain. Coles also allegedly remarked that he disliked conforming to Shari'ah laws in Caribou's business.

When O'Neil and Coles began criticizing Mihoubi heavily in the Spring of 2005 about his failure to produce a business plan and to complete the financial

6

review of the Fong Tat group, Mihoubi complained that he was being discriminated against. On May 11, 2005, Mihoubi emailed Coles and O'Neil alleging that they were discriminating against him on the basis of his religion and national origin. Mihoubi then filed a discrimination charge with the EEOC. The EEOC sent a charge notification, but because it was first sent to Mihoubi's Atlanta office, O'Neil received the notification around July 11, 2005. O'Neil informed Mihoubi that he was being terminated on July 19, 2005. O'Neil testified in her deposition that she had decided to terminate Mihoubi in the first week of July, and simply waited to tell him in person when he arrived in Minneapolis for a meeting.

Mihoubi filed suit against Caribou and Coles under 42 U.S.C. § 1981 alleging that he was terminated for discriminatory reasons and that Caribou retaliated against him for complaining of discrimination and filing a charge with the EEOC.[4] The district court granted summary judgment for the defendants; it held that Mihoubi had failed to provide sufficient evidence to rebut the defendants' assertions of unsatisfactory job performance. The court also found that Mihoubi had failed to prove his retaliation claim in light of O'Neil's testimony that she had decided to fire him before receiving the EEOC charge.

---

[4] Mihoubi also alleged racial harassment but expressly abandoned that claim. Thus, we will not address that issue.

**STANDARD OF REVIEW**

We review a summary judgment ruling de novo. Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1134 (11th Cir. 2004). Summary judgment is appropriate where the pleadings, discovery materials on file, and any affidavits demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

**DISCUSSION**

*I. Discrimination*

The *McDonnell Douglas* analysis for reviewing circumstantial evidence applies here.[5] Rice-Lamar v. City of Ft. Lauderdale, 232 F.3d 836, 843 n.11 (11th Cir. 2000) (noting that this court applies the Title VII *McDonnell Douglas* framework to § 1981 discrimination claims). The parties agree that Mihoubi made out a prima facie case of discrimination and that Caribou responded with a legitimate, non-discriminatory reason for his termination. Under *McDonnell Douglas*, therefore, the burden shifted back to Mihoubi to prove that Caribou's proffered reason was not the true reason, but was a pretext for discrimination. See EEOC v. Joe's Stone Crabs, 296 F.3d 1262, 1273 (11th Cir. 2002). Thus, we must

---

[5] On appeal, Mihoubi concedes that he has presented no direct evidence.

8

determine whether Mihoubi created a genuine issue of material fact regarding whether Caribou terminated him based on an unlawful motive. See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1090 (11th Cir. 2004).

Mihoubi may prove that Caribou's proffered reason for firing him was pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dept. of Cmty Affairs v. Burdine, 450 U.S. 248, 255 (1981).

"A plaintiff is not allowed to recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Id. A plaintiff's self-serving affidavit that he was a qualified and talented employee alone are not enough to rebut an employer's legitimate, non-discriminatory reason for firing an employee. Wilson, 376 F.3d at 1090. The plaintiff's version of events is, however, still relevant. See Hinson v. Clinch County Ga. Bd. of Educ., 231 F.3d 821, 830-31 (11th Cir. 2000) (holding that the

9

plaintiff successfully challenged the believability of the defendants' stated reasons for transferring her by explaining in detail that the provided reasons were inconsistent and obviously irrational); see also Chapman, 229 F.3d at 1029-31 (faulting the plaintiff for not responding to the specific criticisms, but instead claiming that he performed well in other areas of his job). If, however, the plaintiff specifically counters the employer's description of events with his own version contending that he did not perform poorly and that the employer mischaracterizes his performance, that creates a question of fact for the jury that should not be decided by the court on summary judgment. Hinson, 231 F.3d at 832.

Caribou proffered three legitimate, non-discriminatory reasons for firing Mihoubi: (1) his general poor performance since he was hired, (2) his failure to create a proper business plan, and (3) his total failure to produce background financial information for the Fong Tat deal. "In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable fact-finder to conclude that *each* of the employers proffered nondiscriminatory reasons is pretextual." Chapman, 229 F.3d at 1037; see also Combs, 106 F.3d at 1543 (granting summary judgment for the employer where the employee rebutted only two of the three non-discriminatory reasons given by the employer).

Mihoubi successfully created a question of fact concerning Caribou's claim

that it had continual problems with Mihoubi since he started. Mihoubi supported

his testimony with evidence of his substantial bonus, his achievement in procuring

franchises throughout the middle east, and the "superstar" evaluation he received.

Unlike the vague assertions of good qualifications in Chapman, this evidence does

not merely challenge the wisdom of the decision to fire Mihoubi. Rather, it calls

into question the veracity of Caribou's statements that it believed him to be a poor

employee. Chapman, 229 F.3d at 1030 (noting that the issue is whether the

employer gave an "honest explanation of its behavior"). A reasonable fact-finder

could view these facts as evidence that Caribou did not itself believe that Mihoubi

was performing poorly prior March 2005. Although Caribou disputes the

importance and relevance of Mihoubi's evidence, those arguments go to weight

and credibility and should be presented to the fact-finder. Combs v. Plantation

Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997).

Even assuming that Mihoubi performed his job well through the Al-Sayer

deal, however, Caribou cited significant problems with Mihoubi's performance

that arose *after* the Al-Sayer deal was completed, Mihoubi's bonus was paid, and

he received his 1B rating.

Mihoubi only partially succeeded in challenging Caribou's complaints

regarding his business plan. Caribou alleged that Mihoubi did not produce a

11

sufficiently detailed business plan and that his plan presentation on June 7, 2005 was inadequate. Mihoubi created a question of fact about the adequacy of his June 7, 2005 presentation. Mihoubi testified that he was prepared to and attempted to give his presentation, but that O'Neil prevented him from doing so. This testimony, together with the evidence of discriminatory statements made by O'Neil, could lead a reasonable fact-finder to conclude that O'Neil was likely motivated by discriminatory animus. See Jones v. Bessemer Carraway Med. Ctr.,151 F.3d 1321, 1323 n.11 (11th Cir. 1998) ("Language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext").

Mihoubi, however, failed to rebut Caribou's assertions that his business plan itself was deficient. At oral argument, Mihoubi contended that he produced a business plan, but conceded that O'Neil deemed it inadequate; Mihoubi maintained that O'Neil did not have experience with business plans and, therefore, that her evaluation of the adequacy of the business plan is not credible. These arguments simply dispute his employer's business judgment. To establish pretext, Mihoubi needed to present evidence that he produced a business plan that met Caribou's purposes but that Caribou rejected the business plan for discriminatory reasons. Mihoubi has failed to do that on this record. Additionally, Mihoubi's claims that

he was never asked to produce a plan until the spring of 2005 is irrelevant. The problem was that, when asked, Mihoubi did not deliver what his employer requested him to deliver. This is a legitimate, non-discriminatory reason to terminate an employee.

Additionally, Mihoubi failed to rebut Caribou's proffered legitimate reason for terminating him based on his failure to complete the requested background financial research on the Fong Tat deal. Mihoubi argues that this research was not necessary because the deal was already established, but he offered no evidence that he actually performed this task. A terminated employee does not prove that the employer's proffered explanation is a pretext by claiming that the work he was given was unnecessary. The employee must prove he performed the work he was given and performed it to the satisfaction of his employer but was fired despite this good performance. Mihoubi failed to create doubt as to Caribou's truthfulness regarding his poor performance on the Fong Tat deal, and in fact, Mihoubi confirmed Caribou's allegation that he failed to do the research he was asked to do.

Because Mihoubi failed to rebut all of Caribou's proffered non-discriminatory reasons for his termination, we must affirm summary judgment for the defendants on Mihoubi's discrimination claim.

13

## II. Retaliation

Mihoubi also appealed the district court's denial of his claim that he was terminated on July 19, 2005 in retaliation for the internal complaint he sent on May 11, 2005 and the EEOC charge that was filed on June 21, 2005.[6]

Caribou responded that O'Neil made the decision to fire Mihoubi in the first week of July before she received the EEOC charge (which Caribou asserts was July 11 at the earliest). Caribou provided O'Neil's testimony as evidence that she decided to fire him based on his poor performance rather than as retaliation for his complaints of discrimination. O'Neil testified that she waited until July 19 because Mihoubi would be in Minneapolis on that date and she could speak to him personally.

To establish a claim for retaliation, Mihoubi must show that: (1) he engaged in statutorily protected activity[7]; (2) he suffered an adverse employment action; and (3) there was some causal relationship between the two events. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). "Causal link" has been construed broadly and has been established if the plaintiff merely proves that the

---

[6] We note the Supreme Court has affirmed that § 1981 encompasses retaliation claims. CBOCS West, Inc. v. Humphries, — U.S. —, 2008 WL 2167860, at *12 (May 27, 2008).

[7] Appellees briefly argue in a footnote that the May email was not "protected activity" because it was incendiary and referred only to national origin and religion (which § 1981 does not cover). However, Appellees abandoned this argument by making it only in passing. Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

two actions are "not completely unrelated." Id.

Causation may be inferred by close temporal proximity between the protected activity and the adverse employment action. Thomas v. Cooper Light., Inc., 506 F.3d 1361, 1364 (11th Cir. 2007); Brungart v. BellSouth Tellcomm., Inc., 231 F.3d 791, 799 (11th Cir. 2000) ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."). If temporal proximity is the only evidence, however, the timing must be "very close." Id. Even assuming the timing as set out by Caribou, O'Neil received the EEOC charge sometime after July 11 and fired Mihoubi on July 19. This less than eight day period is "very close." See Hudson v. Int'l Computer Neg., Inc., 499 F.3d 1252, 1265 (11th Cir. 2007) (finding that eight days from notification of a need for long-term disability to termination was "very close").

There is no causal connection, however, if the person who made the decision to terminate the employee learned of the protected activity after he fired the employee. See Clark County School District v. Breeden, 532 U.S. 268, 273 (2001); see also Brungart, 231 F.3d at 799. In Brungart, this court held that the decision-maker's unrefuted testimony that he knew nothing of the protected

15

activity when he fired the employee was enough to destroy the inference of causation from temporal proximity alone and thus rebut the prima facie case made out by the employee. Id. at 800. Brungart, however, can be distinguished from the present case. In that case, there was unrefuted testimony that the decision-maker had not heard of the protected activity when he fired the employee. Id. Here, O'Neil had heard of the protected activity when she fired Mihoubi—she had received the EEOC charge notification less than eight days before she fired him—but she tries to get around that by asserting that she had already made the decision to fire him a week before receiving the notification. O'Neil has produced no evidence to support her testimony that she made the decision to fire Mihoubi prior to learning of the EEOC charge. We, therefore, find that Mihoubi has succeeded in establishing a prima facie case of retaliation.

Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to provide a non-retaliatory, legitimate reason for firing the employee. Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008). Caribou provides the same evidence discussed above of Mihoubi's poor work performance on the business plan and the Fong Tat deal in the months leading up to his termination on July 19, 2005. As we discussed, Mihoubi has failed to rebut Caribou's overwhelming evidence of his poor performance on those

16

projects. We, therefore, affirm the district court's summary judgment ruling for Caribou on Mihoubi's retaliation claim.

*iii. Claims Against Michael Coles*

Because we find that Mihoubi's claims fail as a matter of law, we need not address whether Mihoubi abandoned his claims against Michael Coles.

## CONCLUSION

For the foregoing reasons, the district court's summary judgment ruling is **AFFIRMED**.